**TITAN METAL MFG. CO. (TITAN EM-PLOYEES PROTECTIVE ASS'N et al., Intervenors) v. NATIONAL LABOR RELATIONS BOARD.**

No. 6789.

Circuit Court of Appeals, Third Circuit.

July 20, 1939.

Writ of Certiorari Denied Dec. 4, 1939.

See 60 S.Ct. 260, 84 L.Ed. ——.

M. Ward Fleming and W. Bruce Talbott, both of Bellefonte, Pa., for petitioners.

Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, and Laurence A. Knapp, Allen Heald, Owsley Vose, and Malcolm F. Halliday, all of Washington, D. C., for respondents.

Before BIGGS, CLARK, and BUFFINGTON, Circuit Judges.

CLARK, Circuit Judge.

The protagonists in the field of labor economics concede, as they must, that it does take *two* to make a bargain. As to *one* of the *two,* the other has allowed its sense of advantage to overcome its sense of reality. A restoration of balance has raised the problem of the "so-called company union". The use of the expression outlines the controversy. One side would substitute "correctly" for the conventional "so" and the other prefers the contrasting "employees association". The emphasis follows the point of view. It is interesting to note that the famous section 7(a) (2) of the National Industrial Recovery Act, 15 U.S.C.A. section 707(a), subsection 2 uses the phrase "company union", that section 77B of the Bankruptcy Act, as amended, 11 U.S.C.A. section 207, subsection (*l*), prefaces it with the "so-called" (*l*) of our earlier sentence, and that the Wagner Labor Disputes Act, 29 U.S.C.A. § 158, subsection 2 makes no mention of it. In any event the task intrusted to the National Labor Relations Board first, 29 U.S.C.A. § 159, and to this Court second, 29 U.S.C.A. § 160, subsection (e) is tantamount to determining which appellation more accurately fits a particular grouping of employees.

Some find in the history of company unions the gradual disintegration of another "noble experiment". The movement originated (circa 1898) in the desire of some few socially minded employers (notably Filene and Rockefeller, Jr.) to afford their workers some form of what they were pleased to call industrial democracy. It continued under the impulse of a patriotic coöperation in winning the war. Its widespread adoption coincident with the National Industrial Recovery Act, 15 U.S.C.A. § 707(a), subsection 2, above cited, called attention to its possible negation of that essential characteristic of a bargain mentioned at the beginning of this opinion. The extreme pros and cons are best set forth in the following books and pamphlets, pro—Burton, Employee Representation (V Human Relations Series); con—Dunn, Company Unions; Brooks, Unions Of Their Own Choosing; Company Unions, A Study Outline with Special Reference to the I.L.G.W.U., issued by Educational Department, International Ladies Garment Workers Union (pamphlet); whereas more impartial studies are to be found in Leiserson, Company Unions, Vol. 4 Encyclopaedia of the Social Sciences, p. 123; Labor and The Government (Twentieth Century Fund); Cummins, The Labor Problem in the United States; Characteristics of Company Unions, 1935, Bulletin No. 634, United States Department of Labor, Bureau of Labor Statistics (pamphlet); Fairley (Professor, Massachusetts Institute of Technology), The Company Union in Plan and Practice (pamphlet). It may not be inappropriate to quote briefly from Professor Cummins: "Among the

movements instituted by the employers in an effort to improve their industrial relations, employee representation may probably be regarded as the most significant. It has assumed larger proportions than any other, has gained the support of a larger number of employees, and has probably been looked to by a larger number of people as offering the greatest hope of a satisfactory solution to the labor problem. Organized labor has reenforced this impression by reserving its biggest guns for this scheme, giving every indication of regarding it as one of the gravest menaces to trade unionism that has yet appeared on the industrial horizon". Cummins, The Labor Problem in the United States, p. 430.

"While it is a precarious undertaking to try to measure motives, it nevertheless seems fairly apparent that one cause for the spread of employee representation is the employer's desire to frustrate the union. In passing it should be mentioned that there are probably some employers who have no thought of the union in mind, or at least who think of it only in the vaguest way. In some cases the union has never threatened and there was not the slightest prospect of union organization when the plan was introduced. On the other hand, it is a matter of observation that the presence of a union or the threat of one has played an important part in the development of employee representation. * * * Employers as a class have furnished ample evidence that they do not yearn after trade unions. They are, however, shrewd enough to see that the trade union arose in response to an insistent desire on the part of workers to bargain collectively; and though they may hold ever so stubbornly to the position that the business is theirs and that no outsider has a right to interfere, they are realists enough to see that they cannot escape interference, however unjustifiable, on the part of their employees and that consequently their best bet is to beat the unions at their own game. This is where employee representation comes in. It allows the employees to bargain collectively to some degree at least, and if presented to them in the proper way, may even convince them that their interests will be as well protected by an organization of workers in their own plant as by an organization of workers in the entire craft or industry, perhaps even better protected. At any rate the thing has seemed worth trying to a good many employers".

Cummins, The Labor Problem in the United States, pp. 437, 438.

A temperate summary of the objections to company unionism is contained in Section 3 of Professor Fairley's pamphlet, pp. 17–25. See also Dunn, Company Unions, Chapter 12, Labor's Case Against The Company Union, pp. 175–183; Labor and The Government (Twentieth Century Fund), Chapter 13, Problems in Collective Bargaining, subsection 2, Company Unions, pp. 325–331; Employer Interference With Lawful Union Activity, 37 Columbia Law Review 816, 828 (note). But see contra, Burton, Employee Representation (V Human Relations Series), Chapter 13, Terms and Conditions of Employment, p. 247.

Some apprehension of evil seems to have permeated the Congress contemporaneously with the decline of the reason for patriotic fervor. As often in the give and take of the democratic process, the therapeutic effort of the legislative body (the Congress) stopped short of a major operation. Company unions or employee associations have not been outlawed, Employer Interference with Lawful Union Activity, 37 Columbia Law Review 816, 829 (note), but have been regulated. A comparison of language indicates that the lapse of time has narrowed the gulf between limitation and prohibition.

The first regulatory law and the first administrative board were the Railway Labor Act and the Board created thereunder, 41 Stat. p. 456, 45 U.S.C.A. § 131. This enactment had a pathetic legal history. It received its first blow in our own Circuit, Pennsylvania R. R. System and Allied Lines Federation v. Pennsylvania R. Co., 3 Cir., 1924, 1 F.2d 171, and its coup de grace from the Supreme Court's affirmance thereof, Pennsylvania Railroad System & Allied Lines Federation v. Pennsylvania R. Co., 1925, 267 U.S. 203, 45 S.Ct. 307, 69 L.Ed. 574; Effect of the Railway Labor Act of 1926 Upon Company Unions, 42 Harvard Law Review 108 (note); Labor Law—The Present State of Section 7 (a), 21 Virginia Law Review 677 (note); Section 7 (a) of the N.I.R.A.: An Attempt to Equalize Bargaining Power, 34 Columbia Law Review 1529, 1537 (Legislation). These decisions have been questioned in a note entitled, Enforcement of Duties Under the Labor Provisions of The Transportation Act, 38 Harvard Law Review 374. As often, the Congress speedily reenacted what the Court had denied to be

its original intention. An amendment of May 20, 1926 inserted the "teeth" required by the school of dentistry to which the Justices of the Supreme Court, but not the editors of the Harvard Law Review, belonged, 45 U.S.C.A. § 151 et seq. The aforesaid grinders received the blessing of their sponsors in the case of Texas & New Orleans R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034. The pertinent section is subsection 3 of section 2 of the Act and is to be found in Section 152 of 45 U.S.C.A. It reads as follows: "Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier".

In interpreting this language, Mr. Chief Justice Hughes described the essence of a bargain in the cogent language often quoted in National Labor Relations Board briefs, Texas & New Orleans R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U. S. 548, above cited, at page 559; 50 S.Ct. 427, 74 L.Ed. 1034.

The economic orgy of 1929 required the economic regeneration of 1933. Among the bromos administered was the National Industrial Recovery Act. Section 7(a), 15 U.S.C.A. section 707(a), subsection 2, above cited reads:

"(1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;

"(2) that no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing".

Even superficial thought about "interference, restraint and coercion" leads to wonder about their meaning. When the thought is not only not superficial but that of antagonists, the possibility for a "great variety of conflicting interpretations" is apparent. The author of the article, Professor McNatt, from whom we have just borrowed a phrase, discusses these various interpretations in an interesting and, we think, sound article, Organized Labor and The Recovery Act, 32 Michigan Law Review 780. The learned author cites or quotes from the views of the Chief Executive, General (Blue Eagle) Johnson, the National Labor Relations Board and of the courts. These differing interpretations were not satisfactory to the labor side of the controversy and their dissatisfaction resulted in Senator Wagner's introduction on March 1, 1934 of S. 1068, McNatt, Organized Labor and The Recovery Act, 32 Michigan Law Review 780, above cited, at p. 799. This bill as finally enacted is our authority for proceeding with the case at bar.

The bill, as drafted, attempted considerable precision. It read: "It shall be an unfair labor practice for an employer, or anyone acting in his interest, directly or indirectly. * * * (3) To initiate, participate in, supervise, or influence the formation, constitution, bylaws, other governing rules, operations, policies, or elections, of any labor organization. (4) To contribute financial or other material support to any labor organization by compensating anyone for services performed in behalf of any labor organization, or by any labor organization, or by any other means whatsoever". S. 1068, section 5.

It is not our place to comment upon the emasculation that occured in process of passage. Others have done so, McNatt, Organized Labor and The Recovery Act, 32 Michigan Law Review 780, above cited; Employer Interference With Lawful Union Activity, 37 Columbia Law Review 816 (note); The Wagner Labor Disputes Act, 35 Columbia Law Review 1098 (Legislation). As approved by the President, section 158 of 29 U.S.C.A. reads: "(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him

during working hours without loss of time or pay."

It might be fair to call this vaguer than the draft and more definite than the cognate provisions of the Railway Labor Act, 45 U.S.C.A. § 152, and the National Industrial Recovery Act, 15 U.S.C.A. section 707 (a), subsection 2. At any rate it has been so described: "The new Act definitely permits the existence of company unions but makes it an unfair labor practice for the employer to dominate or interfere with the formation or administration of any labor organization or to contribute financial or other support to it. The absolute prohibition of financial support represents a real advance. On the other hand, the word 'influence' was eliminated between the introduction and passage of the bill, avowedly to permit the employer to express his approval of the company union—a retreat from the position of the old board, in total disregard of the inescapable force of such activity on the part of the person in control of the employees' means of livelihood. It is difficult to determine whether the provision will effect an automatic invalidation of a union structure as to which there has been a finding of employer interference and domination, or whether in continuance of the policy under 7 (a) the employee will merely be given his 'free' choice between conflicting plans; but the problem is rendered somewhat academic by the easy availability of more subtle forms of employer control. In view of the practical incompatibility of real collective bargaining and the existence of a company union, it is doubtful whether any valuable content can be given to the employee's abstract rights short of complete disestablishment of all company unions". The Wagner Labor Disputes Act, 35 Columbia Law Review 1098, at pp. 1103, 1104.

We have given this attention to the background, both legal and economic, of the company union problem because we think it is relevant to the difficulties which confront the National Labor Relations Board and ourselves. One school of labor-relations philosophy regards the "company union" as a contradiction in terms and inconsistent with the very thought of freedom. The other school conceives of the "employees' association" as a spontaneous and untrammeled outpouring of the workers will to fraternize with a benevolent master. This conflict results in a statute lacking the definiteness that comes from the positive espousal of any view. That statute imposes the "delicate and difficult" task of casting light among the shadows and making certain that which is uncertain. The "delicate and difficult" task is complicated by the necessity for its being undertaken in a field in itself delicate and difficult—the adjudication of facts. Of this last we cannot complain. We, as well as the National Labor Relations Board, are constrained to it by our acceptance of office.

The passage of time and existence of controversy have brought into being and into administrative and judicial reports enough "sets of facts" surrounding the creation and continuance of company unions to permit of type analysis. Certain factors are found to recur and to be the logical exemplification of some or all of the prohibitions of the statute. Lien, Labor Law and Relations, Labor and The Government (Twentieth Century Fund) and several law review articles have listed these factors. We think it useful to include that listing as an Appendix to this opinion. Moreover, we think it convenient and we hope convincing to use these lists as a guide in our own synopsis of the facts of the principal case. We proceed then to inquire, first, how far the evidence indicates the presence of any, some or all of these factors and then, second, to appraise them in the light of the statute.

As neutrality is the touchstone, its violation may be either positive or negative, and in both categories, general and specific. For that reason, hostility to unions (craft or industrial) other than company, and the lengths to which that hostility goes, is relevant. By the same token, the lengths to which its manifestations extend are of interest. An organization meeting for a metal trades craft union of the American Federation of Labor was held in Bellefonte, the home of the petitioner company. This meeting was attended by seventy-five of its employees. Upon hearing thereof, the president of the company expressed himself in no uncertain terms. In a letter to his employees, dated March 26, 1935, he said: "The American Federation of Labor at the present time, is behind legislation which will decrease your average pay check still more, increase your company's costs and eventually force a real 'closed shop' where the noise of production has died away, where machinery hummed, spiders will spin their webs and where the tread of industrious workmen has given

away to the creep of *cowardly rats"*. (Italics ours.) Board's Exhibit 20.

A copy of this letter was also posted on the Bulletin Board of the plant together with a statement quoting 7 (a) of the N. R.A. and beginning: "Our attention has been called to the fact that parties outside of our plant have been intimidating our employees and making false statements". App. 5; Board's Exhibit 20.

Upon being presented with an agreement proposing recognition, the same gentleman had this to say: "I will have nothing to do with it. Boys, I have been through the mill three times before. It is no good. That is the reason that I am in Bellefonte today, fighting organized labor. I will not operate a plant affiliated with the American Federation of Labor or any other Union". App. 93–4.

The depth of his feeling on the point is illustrated by the threats to move his plant. One was contained in the employee letter already referred to and the other made at the time of the presentation of the recognition agreement, App. 96, 105–6. We may say that we feel that petitioner's president's reference to the price of copper on the Jersey coast rather reminds us of Gilbert and Sullivan's, "Up goes the price of shoddy", from The Gondeliers, in reverse and is impressive as an afterthought rather than as an explanation.

Following the general psychological principle that "you can't beat something with nothing", a meeting of seven Titan employees resulted upon the circular letter above quoted. These employees agreed to call a more general meeting for the purpose of considering the organization of a "plant" union, App. 136. This thought was reenforced by the circulation of petitions for the establishment of the Titan Employees Protective Association, App. 137, 138. This meeting was held in the plant laboratory on company time, and the petitions appeared at the plant and during working hours. The National Labor Relations Board and this Court are asked to believe that no one present at the meeting can now remember how they happened to be there, App. 136, 139; Typewritten Transcript, p. 2370. The origin of the petitions is likewise shrouded in mystery. The signed petitions were presented to the president at his office and he expressed his pleasure therewith, App. 64.

The meeting for the organization of the Titan Employees Protective Committee was called by a notice pasted in the inside cover of a booklet advocating a plan for group insurance. The blank application for membership included an expression of desire for the free benefits thereof, Board's Exhibit 24; App. 7–8, 16, 17, 38. Petitioner would have us believe that the management of a large industrial plant knew nothing of the circumstances surrounding the presentation of a group insurance plan to its employees. If so, it seems unfortunate that the talk of the insurance agent, Mrs. Fauble, should have left a certain amount of confusion in the minds of at least some of the employees. This general meeting was duly held on the premises, operations being suspended at the time, App. 136–6, 138. After an explanation of the dual purpose of protecting the present and future economic welfare of the employees by means of group association and group insurance, officers were elected and the aforesaid application cards distributed, App. 9–10, 10–11, 47, 102, 137, 140–1.

The president of the newly formed Association promptly advised the president of the company that eighty per cent of his employees had signed these application blanks. On that basis, he requested recognition of the Association as a collective bargaining agency, Board's Exhibit 30; App. 126, 128. Two days later, the president granted the request and signified his gracious acceptance thereof in a four sheet folder which reprinted the exchange of correspondence and was distributed throughout the plant. Perhaps skepticism is unwarranted. We cannot, however, forbear two quotations from Board's Exhibit 30—one from each letter:

" * * * gradually a plan was developed by the very natural method of elimination and substitution of ideas. * * * Briefly, it's purpose is to be an independent union, as opposed to what is commonly known as a company union. It's simple aim, the welfare of the workers". Letter of the President, Titan Employees Protective Association, April 13, 1935.

"Should there be any question among your members, officers or representatives as to the legality of your Association, we shall welcome a request for a Federal government supervised election to determine whether there is any question as to the right of your independent union to be the bargaining agency between employees and management". Letter of the President, Titan Metal Manufacturing Company, April 15, 1935.

Is this the language of free will and accord or the "double-talk" of those acting under "advice of counsel"?

The negative and positive sides of the statutory shield of neutrality appear also in more specific approaches to employees. They are warned against joining the craft union and they are urged to join the employees' association. The warnings run the gamut from references to the American Federation of Labor union as "radicals and reds", App. 50–1, through loss of desirable job assignments, App. 109, to actual threats, App. 55, 62–3, 65, 68, 79, 118. Finally, a series of discharges contradicted the old saying that "a threatened man lives longer", App. 61–2, 65, 65–6, 82, 118. The contrasting solicitations are equally open, free and vehement, App. 14–5, 70–1, 73–4, 83–4, 87–8. They continued even to the circulation of slips of withdrawal from the American Federation of Labor union, Board's Exhibit 39; App. 27–9, 30–2, 142–3, 145–6. We quote the actual language of one of the solicitations, because of both its source and content: "They are putting up a kick about you fellows not joining. They all belong except you. It is not compulsory but I want it to go through a hundred per cent". The vice-president and son of the president, App. 115.

We might say that both the threats and the promises are uttered by foremen or higher employees on company time and on company property. We are not concerned, therefore, with the disturbing question of how much responsibility creates a "supervisory" employee, Van Dusen, What Is Employer Domination Or Support?, 13 Temple University Law Quarterly 63, at 83.

The Association so created adopted an impressive constitution and by-laws, Board's Exhibit 40 (chartered as a non-profit Association under the statute of Pennsylvania on June 8, 1935). The booklet in which they are printed contained as well a poem by James Russell Lowell, The Heritage (we refrain from questioning what precedes the "six feet of sod") and a foreword analyzing the "clash of classes" (a somewhat different analysis apparently from that of the Wagner Act, 29 U.S.C.A. § 151 et seq.). This constitution is not of the cruder sort sometimes found as a part of similar plans. It does not give the employer any veto over amendments, or over recall of employee representatives, nor does it give him any voice in the affairs of the employee committees. On the other hand, it does not attempt any definition of "official positions", Constitution, Article 1, Section 5, and it makes membership a social rather than economic matter. Employees can be blackballed for any or no reason, Constitution, Article 2, section 2. By the same token the dues, Constitution, Article 5, section 1 (25¢ monthly), seem to speak rather of the "good clean fun" of the lodge meeting than of the grimmer pattern of the strike benefit. At that, the employees did not seem to regard these dues as worthwhile. The petitioner was finally asked by the Association to, and did, apply the familiar union principle of the check-off, App. 17, 25, 48.

It is difficult to give a final judgment on the provision, if any, for collective bargaining. The phrase itself seems to have been, we think it fair to say, studiously avoided. Instead we find such platitudes as "cordial relationship", "reconcile differences", and "make adjustments", By-laws, Article 10, Sections 1 and 2. Nowhere is reference made to wages, hours, or working conditions. As these are the marrow of labor relations, their omission may cast some suspicion on the spirit, if not the letter, of this part of the by-laws. At least it may have appeared so to one foreman. At any rate he is quoted as saying: "Well, there's no use. Young Bill (Sieg) said 'no' and he won't do it. It is a company union". Baney, Typewritten Transcript, pp. 1642–43.

The proof of this pudding, too, may well be in the eating. After a year's trial, and a five per cent raise in wages, the craft union members appear to have lost their appetite.

For on Friday, January 15, 1937, a committee of six employees who had not yielded to the blandishments of the Protective Association but had preferred the American Federation of Labor local (Federal Labor Union No. 19,981) visited petitioner's president, Mr. W. P. Sieg. They requested him to sign an agreement for recognition and the arbitration of wages and working conditions, Board's Exhibit 50, with the union they represented. He asked for time (four days to be exact) saying he wanted to consult absent directors, App. Pet. 166–9. At this interview, Mr. Sieg made reference, on the one hand, to the large membership in the Titan Employees Protective Association, and on the other entirely failed to mention the possibility of

an election, App. 101, 106. Upon hearing these circumstances reported by their committee, the general body of Federal Labor Union No. 19,981 (chartered April 18, 1935) decided that the boss was "stalling", App. 104. They struck at 5:30 that same afternoon and in so doing proved wrong the prophecy of the Pittsburgh organizer of the American Federation of Labor who is quoted as saying: " * * * I doubt if you can get them out, because, those men are afraid of Sieg's shadow, and you are not going to get them out". Record, p. 124.

Although the tallies give some evidence of wishful expansion or diminution, approximately 140 employees, all members of local 19,981, did go out. Most of these resisted plant pressure to return, App. 33, 34, 57.

The petitioner company met the strike, first, by an election resulting in a vote of 287 for the Titan Association to 45 for Federal Labor Union, 19,981, and, second, by giving the victorious Titan Employees Protective Association a veto over the re-hiring of the strikers, App. 31–37. The election procedure, like the plan, shows no sign of the cruder form of unfairness. It was conducted under the supervision of three reputable members of the community (one an Episcopalian priest) and the rival unions appeared on the ballot. It could hardly be said, however, to meet the full requirements of the mechanism fashioned by the political scientists for the effective recording of free choice. The polling place was not on neutral territory. The number of votes cast demonstrates the unwillingness of the strikers, maybe through a sense of fear or a sense of futility, to record any preference. Most ingenuous of all is the form of the ballot, a form we venture to think unique in the annals of this manifestation of the democratic process. "To All Employees

According to the Titan Employees Protective Association Records they have 457 members. The American Federation of Labor claim a majority. This ballot is to determine who will represent the employees in bargaining with the management.

Mark an X in the space you prefer.

Titan Employees Association

American Federation of Labor

This is an official Ballot". Record, p. 126.

We call it unique because it contains in one document a campaign appeal and the opportunity to decide the issue campaigned about. As we have said and as might have been expected, 287 employees preferred the Titan Employees Protective Association and all was peaceful in Bellefonte, peaceful, that is, until the filing of this complaint on June 7, 1937.

We think that this recital makes almost superfluous the second part of the assignment we made ourselves. One might best summarize from our list of factors by way of exclusion. It does not affirmatively appear that the respondent furnished the legal ammunition for the union strafing. Nevertheless, the Titan Employees Protective Association was fortunate in the draftsmen of their constitution, correspondence, et cetera, and in the petition for intervention and argument thereon in this Court. That skill avoided, as we have said, a plan obviously designed to permit easy domination. The cash "support" which is of course only a "weasel word" for bribery, was not indulged in. It was present in the subtler form of a gift of company time and property.

The learned author of the Temple Law Quarterly article above cited raises the interesting question of the applicability of the rule of ejusdem generis to the "financial and other support" of the statute, Van Dusen, What Is Employer Domination Or Support?, 13 Temple Law Quarterly 63, at 79. We have always rather questioned some of the more extreme applications of this long established rule. If relied on here, it might exclude "moral" support and we might have ingenious distinctions between the negative "dominate and interfere" and the positive "contribute". Similar niceties of discrimination might arise in the consideration of occurrences prior to the passage of the statute. Though these are relevant, National Labor Relations Board v. Pacific Greyhound Lines, 9 Cir., 91 F.2d 458, affirmed 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, their precise evidential effect remains undefined. However, we think the evidence in the case at bar is too plentiful both in scope and in chronology to make such legal spinning necessary.

We have a family business comfortably established in a small town in rural Pennsylvania. That business has been small enough to make a benevolent employer's despotism seem both logical and wise. Everyone has been happy and the labor warfare of the outside world has echoed only distantly. Then suddenly economic

conditions and the progress of the labor movement interacting on each other turn that far-off thunder into present lightning. It is human and not surprising to find the employer is shocked and hurt. He hates the dragon that threatens to destroy his industrial idyll. He realizes dimly that both economics and the law (Wagner Act) have left him behind. He has been advised that other employers have met the running of this tide with the help of employee protective association-company unions. It is easy to see how such a state of mind spills over into the overt act forbidden by the statute. Belief in the wisdom of your cause engenders anxiety for its success, and the line between anxiety and action has always been blurred by encroachment. We have tried to make our last paragraphs a sympathetic recapitulation of motivating facts. We can only hope for the wise selection of a labor philosophy and its enactment into a law so clear that it will carry conviction to employee and employer alike. Otherwise, the employer is apt to suffer the economic dissatisfaction that comes from tilting at windmills and the spiritual disillusionment that comes from pretending that he is not so engaged.

We do not consider the citation of authorities in this type of case particularly useful. As the circumstances, by definition, differ, judicial opinions neither control nor enlighten. The learned authors, Lien, Labor Law and Relations, and Van Dusen, What Is Employer Domination Or Support?, 13 Temple Law Quarterly 63, review them thoroughly, intelligently and critically. Many decisions have, of course, been reported since the publication date of this book and this article. Judicial reactions to Board findings may be observed generally in National Labor Relations Board v. Columbian Enameling and Stamping Company Inc., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660, decided February 27, 1939 (Board order set aside), National Labor Relations Board v. Sands Manufacturing Company, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, decided February 27, 1939 (Board order set aside), National Labor Relations Board v. Fashion Piece Dye Works, 3 Cir., 100 F.2d 304 (Board order affirmed), M. & M. Wood Working Co. v. National Labor Relations Board, 9 Cir., 101 F.2d 938 (Board order set aside), National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658 (Board order modified), Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91 (Board order set aside), Montgomery Ward & Co. v. National Labor Relations Board, 8 Cir., 103 F.2d 147 (Board order set aside), Waterman Steamship Corp. v. National Labor Relations Board, 5 Cir., 103 F.2d 157 (Board order set aside except as to one employee), National Labor Relations Board v. C. A. Lund, 8 Cir., 103 F.2d 815 (Board order modified). The company union cases are: Newport News Shipbuilding & Dry Dock Co. v. National Labor Relations Board, 4 Cir., 101 F.2d 841 (Board order modified), National Labor Relations Board v. Falk Corp., 7 Cir., 102 F.2d 383 (Board order affirmed), Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745 (Board order affirmed), Wilson & Co. v. National Labor Relations Board, 8 Cir., 103 F.2d 243 (Board order modified in other respects), Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49 (Board order modified in other respects), National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, decided May 12, 1939 (Board order modified in other respects). A reading of the cases last cited gives the impression that the decisions of the National Labor Relations Board have in this particular field met with increasing approval of the courts and that they have, therefore, taken to heart some of the criticisms expressed by students of their work. We hope we shall be absolved of any desire to seem patronizing in suggesting that they, as well as the employers, must keep free of the temptation to yield to one or another economic philosophy. This difficult divestment is the difference between the judge and the partisan. Its accomplishment is particularly important in matters where the courts are inclined to follow the overworked "substantial evidence" rule, National Labor Relations Board v. Falk Corp., above cited.

A decree enforcing the order of the Board will be entered.

### APPENDIX

1 Hostility to unions or union activity.
2 Ineffectiveness of type or plan of organization.
3 Direct or indirect aid by suggestion or propaganda.
   a) Speeches and statements.
   b) Posters and pamphlets.
   c) Letters or other material mailed to employees.
4 Announcing intent to recognize.

5  Threats and propaganda of removal of the plant.

6  Use of company property and other material aids and support.

7. Activities of foremen and other supervisory employees.

8  Preferential treatment as to solicitation of members on company time and property.

9  Time of organization.

10  Discharges.

Lien, Labor Law and Relations, Chapter 6 Domination Or Interference With The Formation Or Administration Of A Union, Sections 58-67.

1  Where the plan of organization was formulated by the employer, or where the employer took other steps to initiate the plan, or participate in it, in the absence of a request from his employees; or where an employer sponsored any particular labor organization or plan.

2  Where the employer contributed funds for the establishment or maintenance of a labor organization.

3  Where the plan submitted to the employees for their vote was not adequately explained, or where the employees were not given sufficient time for study.

4  Where the meetings to consider the plan were called by management.

5. Where employees were not given an opportunity to express approval or disapproval.

6. Where employees were refused the right to pass upon any form of organization or representation other than the one submitted to them.

7  Where the right to vote was unduly restricted on the basis of tenure of employment.

8  Where employees were instructed how to vote, or even to attend meetings for discussion or voting.

9  Where the employer made any check of which employees had participated in an election and which had not.

10  Where company officials were present at elections.

11  Where there was no secret ballot.

12  Where the ballot was prepared by management.

13  Where an election was held in the absence of a request by the employees.

14  Where the organization, plan or system confined employee representatives to fellow employees, or unduly restricted them in other ways.

15  Where there were oral nominations for representatives.

16  Where the term of the representatives was fixed by the company.

17  Where the foremen or others in a managerial capacity were eligible as representatives.

18  Where the organization, plan or system was without a constitution or by-laws of any nature.

19  Where members or participants were forbidden to join any other labor organization.

20  Where the plan or system of employee representation lacked provision for collective bargaining.

21  Where the employer had a voice in the affairs of the employee committees.

22  Where the plan or system interfered with the collective-bargaining unit desired by the employees.

23  Where the company reserved the right to veto any amendment of the constitution or by-laws desired by the members or participants.

24  Where the company reserved the right to veto the recall of employee representatives.

Labor And The Government (Twentieth Century Fund), Chapter 4 Company Unions: Description And History, pp. 84-85.

Fairley, The Company Union In Plan And Practice (pamphlet) pp. 44–45.

1  Solicitation by supervisory employees.

2  Carrying on activities during working hours or on employer's premises.

3  Explaining the Wagner Act.

4  Suggesting the possibility of forming an organization limited to his own employees.

5  Number of years of existence.

6  Collective bargaining record.

7. As part of a "back to work" movement.

Van Dusen, What Is Employer Domination Or Support? 13 Temple University Law Quarterly 63, at pp. 83–88.

1  An open ballot to decide which union was favored.

2  A form of ballot favoring the company union.

3  Leadership by the management in the formation of the "union".

4  Encouragement by the employer to join the "union".

5  Deficiencies in the contract entered into between the company union and the management.

6 Failure of the union to bargain collectively.

7 No provisions for meetings or votes on important issues.

8 Financial support of the union.

9 The fact that incumbent representatives are tellers at election or are allowed to campaign for reelection on the employer's time.

Author of a note in 37 Columbia Law Review 816, at 830.