NATIONAL LABOR RELATIONS BOARD
v. NEW ERA DIE CO., Inc.

No. 7551.

Circuit Court of Appeals, Third Circuit.

Feb. 26, 1941.

GOODRICH and MARIS, Circuit Judges, dissenting in part.

Mortimer Kollender, of Washington, D. C. (Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Bertram Edises, and Ramey Donovan, all of Washington, D. C., on the brief), for petitioner.

Joseph W. Henderson, of Philadelphia, Pa. (Robert C. Fluhrer, of York, Pa., on the brief), for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The National Labor Relations Board petitions for the enforcement of its order which directs the respondent to cease and desist from certain unfair labor practices, to take affirmative action for the future and to post the customary notices of its intention to comply. The respondent answers that the Board's findings are unsupported by the evidence, that the order is invalid and should, therefore, be denied enforcement.

When the matter was originally argued here, it was suggested that a question was present as to the majority status of the bargaining agent, similar to the question in Oughton et al. v. National Labor Relations Board, 3 Cir., 118 F.2d 486. Consequently when, upon petition for rehearing, the Oughton case was ordered for reargument, the present case was also set down for reargument at the same time.

■ The respondent is a Pennsylvania corporation having its place of business in Red Lion, Pennsylvania, where it is engaged in the manufacture, sale and distribution of steel clicking dies for use in cutting materials in the fabrication of shoes. About twenty per cent. of the materials used in the manufacture of dies, the respondent obtained from points outside of Pennsylvania, and it shipped directly to points outside of Pennsylvania approximately sixty per cent. by value of its manufactured products. These facts appear in material part by stipulation. The Board correctly concluded that the respondent was amenable to the provisions of the National Labor Relations Act.[1] The disruption of respondent's business because of labor troubles would directly affect the flow of interstate commerce. Cf. National Labor Relations Board v. Bradford Dyeing Association (U. S.A.) et al., 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S. Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57. S.Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352.

The parties also stipulated that the unit appropriate for the purposes of collective bargaining should consist of all production and maintenance employees of the respondent, exclusive of supervisory and clerical employees. And the Board accordingly so concluded. There were thirty-nine such employees in the unit.

The Board found that the respondent, in violation of Sec. 8(1) of the National Labor Relations Act, had interfered with, restrained and coerced its employees in the exercise of rights guaranteed to them by Sec. 7 of the Act; that it had refused, in violation of Sec. 8(1) and (5) of the Act, to bargain collectively with the representative (International Association of Machinists) chosen for such purposes by a majority of its employees; and that, in violation of Sec. 8(1) and (3), it had discriminatorily treated one Eby, an employee, because of his union activities. It is these findings which the respondent contests.

■■ Upon questions, such as are here raised, it is not within our province to make findings independently of the Board. The Act commits the fact-finding function to the Board exclusively. Sec. 10(c). Necessarily therefore the credibility of the witnesses and the facts testified to by them, as well as the reasonable inferences to be deduced therefrom, are for the Board's consideration. Our duty upon a review of the Board's action, in addition to passing upon any question of law involved, is to determine whether there is substantial evidence which, if believed, supports the Board's findings either directly or circumstantially. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 84 L.Ed. 704.

In substantial part, the material testimony was undisputed and no important conflict of fact has been called to our attention. It

---

[1] 49 Stat. 449 et seq., c. 372, 29 U.S.C.A. § 151 et seq.

is the inferences and conclusions, rather, which the Board drew from the testimony, whereof the respondent complains, contending that the Board erred in concluding that the management's action was designed to interfere with, restrain and coerce the employees in the exercise of their right to organize and to bargain collectively through representatives of their own choosing. It is the respondent's contention that, contrary to the Board's conclusion, the management's action was intended in the company's and, by the same token, the employees' best interests.

In support of its argument, the respondent stresses that the company was new (incorporated in 1937) and, consequently, its position in the industry not yet so established that union requirements could be met; that its employees, who were relatively few (thirty-nine in production and maintenance; forty-six in all), were highly interdependent in their work and all were in proximity to the management at all times; that there was no need for an outside independent agency as the bargaining representative of the employees; and that when the employees fully perceived and appreciated these facts, they, of their own choice, revoked the union's authority.

■ Unfortunately for the respondent's contention, the management's handling of the matter was such as to justify the Board's conclusion that the respondent did not permit its employees to enjoy the freedom of choice which the National Labor Relations Act contemplates. The speeches of Dedrick, formerly plant manager and later president of the company, at meetings of the employees which he called on company property, and in one instance on company time, during the employees' organizational activities, were thinly veiled threats that, if the employees chose the union for bargaining agent, the plant would close down and they would all lose their jobs. This innuendo, Mosher, plant superintendent after Dedrick's elevation to the company's presidency, buttressed with statements of like import. It was easy to forecast the probable effect of this conduct. As observed by this court in National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 722, "the employee is sensitive and responsive to even the most subtle expression on the part of his employer, whose good will is so necessary, * * *." And, what was foreseeable was what actually happened. The testimony of several of the employees who had joined the union but later signed revocations of their prior union authorizations gave reasons for their action which indicate the certain effect of the management's threats. One said "Well, why I signed it [the revocation] was to keep the shop from shutting down and would be more safer on the job; if the shop shut down we had no jobs." Mosher, the superintendent, had just told this witness prior to his signing that "The ones that sign it will be the ones that will get the gravy around the shop." According to the witness, "gravy" meant the chance "to put in * * * extra time". Another testified as a reason for his revoking the bargaining agent's authority "* * * that we heard about the shop closing up, and different things like that. I was the same as the rest of the guys; I didn't want to be out of a job." And another, a witness for the respondent admitted on cross-examination as his reason for signing the revocation that he was "afraid that the plant would close if * * * [he] did not sign it." The Board's finding that the respondent coerced its employees in respect of their exercise of their right to bargain collectively was warranted.

■ As much may be said for the Board's findings that the respondent interfered with and restrained its employees in the exercise of their rights. After twenty-five of the employees (more than a majority) had signed cards authorizing the union to represent them for collective bargaining, Cederholm, the union representative, immediately notified the respondent to that effect and requested a conference for the purposes of the union's representative function. Instead, however, of acceding to its employees' own choice of a bargaining representative, the company failed to respond to Cederholm and immediately caused a petition to be circulated among the employees (Mosher saw to it through the foremen), calling upon them to make a signed choice on the petition between a union and an open shop,—a spurious issue. The respondent thus actively interfered with the exercise of its employees' rights by going "over the heads of the representatives to their constituents; to discredit them as representatives, to destroy their power to bargain as such." National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 870, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540. The worthlessness of the company's peti-

tion as any evidence of its employees' free and untrammeled choice could hardly be better indicated than by what is disclosed concerning the signing of the petition. Although within ten days or so prior to the circulation of the petition twenty-five of the employees had signed up with the union as their bargaining representative, when the petition was circulated, thirty of the total thirty-nine employees· signed for an open shop and none for a union. The bald form of the employer-sponsored "poll" was not without its desired effect. Cf. Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254, 260, certiorari denied 308 U.S. 615, 60 S.Ct. 260, 84 L.Ed. 514.

■ Three times Cederholm for the union endeavored to bargain collectively with the management, and each time the opportunity was denied. At the conferences held, the time was largely consumed by the management in an effort to prove to Cederholm that the union did not represent a majority. And, upon the occasion of Cederholm's last visit, for which he arranged by telephoning Mosher and at which Raub, secretary of the company, was also present, the time was taken up in controversy over Cederholm's demand that the shop committee (Eby, Kelly and Hibbs) be summoned, which Mosher rejected. As a conclusion to ·the meeting, Mosher, for some reason not accounted for by him, apprehended personal harm to Cederholm and warned him that he had better not remain in town over night—"somebody is out to get you." Cederholm left the place of meeting but did not leave town immediately. Shortly after he had gone, ten or twelve of the employees arrived at Raub's office (the place of the conference) seek·ing Cederholm. They had noisily rushed out of their place of work without interference from foremen or supervisors upon the rallying call of one Poet, an employee, "Come on, fellows, let's go." Nor did Mosher or Raub reprove them for having left their place of employment during working hours. When told by Mosher that Cederholm had gone, all but four of the group returned to work, but the four continued to roam the town until they met up with Cederholm and told him that it would not be "healthy" for him to remain in town and advised him not to make any more complaints to the Board against the_ respondent. Was this treatment of the union representative inspired by the company?

The Board was justified in its conclusion that it was at least encouraged and approved by the company. And being so encouraged, it constituted an interference with the employees' bargaining rights for which the employer is responsible. National Labor Relations Board v. Ford Motor Company, 6 Cir., 114 F.2d 905, ,911, 912, certiorari denied 61 S.Ct. 621, 85 L.Ed. ——. See also Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 44.

■■ The respondent argues that it was under no obligation to bargain collectively with the union, alleging, in this connection, that Cederholm failed to furnish proof, upon request, that the union actually represented a majority of the employees. It has been held that it is a bargaining representative's duty, when an employer in good faith questions its majority status, to offer, and it is the employer's duty to accept, some reasonable method for ascertaining the truth of the representative's claim. Matter of The Serrick Corporation, etc., 8 N.L.R.B. 621, enforced in International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 71 App.D.C. 175, 110 F.2d 29, affirmed by the Supreme Court, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——. But Cederholm cannot be said to have refused the requested proof. He suggested that the respondent inquire of the Philadelphia office of the National Labor Relations Board where the signed cards of the employees were on file but the respondent made no such inquiry. Cederholm did refuse to show Mosher the signed cards. To have done so would have been to deprive the employees of their secrecy of choice which the Act is designed to secure. The undeniable fact is that a majority of the employees had authorized the union to bargain collectively for them and the respondent took no reasonable steps to ascertain that fact. The Board was "convinced that the respondent never intended to bargain collectively with the Union, and merely utilized an asserted doubt regarding the Union's status as majority representative to evade bona fide collective bargaining with the Union". The evidence in the case justifies that conclusion.

■ The respondent's remaining contentions in attempted impairment of the union's majority are devoid of any merit. Relying upon the fact that the employees signed their union affiliation cards on a Sunday, the respondent cites a Pennsylvania statute of 1794, 18 P.S.Pa. § 1991,

on Sunday observance and a state case applying that statute. In cases where local law is controlling, federal courts are, of course, bound by it, but here we are concerned with the enforcement of a federal statute which must be unaffected by local enactments. In any case, a thing as important to life as wages, hours of work, and other conditions of employment, is above the ordinarily secular. The requirements upon the time of workers during the rest of the week make Sunday peculiarly a convenient day for them to assemble concerning matters of fundamental importance to them and to their community in general. In this connection, it is not irrelevant to observe that those who would exact strict Sunday observance in order to retain for themselves an economic advantage would do so in the face of divine precedent for the performance on the Sabbath of a service for human welfare; Matthew, XII, 10–12. Equally unworthy is the respondent's contention that, because several of the union members were minors, their authorization of the union to bargain and contract for them was voidable, as if legal majority were essential to a worker's right to select a bargaining representative. If such were the law, then in units where minor employees predominated, they would be unable to bargain collectively at all. But, it is the majority choice of the employees in an appropriate unit, and not just of the adults among them, which the National Labor Relations Act contemplates; hence, anyone old enough to be employed is old enough to vote for a bargaining agent.

Nor is any denial of the right of freedom of speech, which the respondent espouses, present in this case. It may be conceded that some of the statements by Dedrick, Mosher and Null, the office man, which the Board rightly considered of importance upon a question of the management's motive and intent, went no further in their derogation of the union than Ford's Viewpoint on Labor and the "Fordisms" contained in the pamphlets handed out to the workers at Dearborn. See National Labor Relations Board v. Ford Motor Company, supra, 114 F.2d at pages 913, 914. But no one here is restrained from uttering anything. The Board's order contains no such provision. The management now, as heretofore, may freely give currency to their views. Ford case, supra, 114 F.2d at pages 913-915, 916. What the respondent apparently misconceives is that the right to entertain opinions and to express them freely does not carry with it freedom from responsibility for the intended or reasonably foreseeable consequences in so far as the utterance may restrain or impair the rights of others. The fact that expression is free does not mean that the utterer may not be called upon to answer for it by way of being held accountable for the effect of his expressions. The evidentiary value of the utterance, when competent and material, is ever present. Coercion may be thus established, if the proof be sufficient and although the proof may result from one's exercise of his right to speak freely. It may be further noted that in the Ford case, unlike here, the assailed speech "contain[ed] no threat of discharge or discrimination" (114 F.2d page 913). If the respondent should reply that no threat of discharge was made in this case, the answer is that the implication of the threat to close the plant was tantamount to a threat of loss of employment and was so interpreted by a number of the employees.

The respondent complains that it was denied the right by the trial examiner to show by the testimony of the twenty-one employees who revoked their authorizations of the union that they did so voluntarily, and asserts that the Board erred in approving the examiner's action. It should be noted, however, that the refusal of the respondent to bargain collectively and its commission of the other proven unfair labor practices occurred before, and still existed when, the revocations were executed. In such circumstances it is impossible to establish that the employees, when they revoked, acted with the full freedom of choice which the Act requires. The testimony was therefore properly rejected as immaterial. International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 88, 85 L.Ed. ——. See National Labor Relations Board v. Bradford Dyeing Association (U.S.A.) et al., 310 U.S. 318, 340, 60 S.Ct. 918, 84 L.Ed. 1226; Oughton et al. v. National Labor Relations Board, supra.

The evidence warrants the Board's conclusion that the respondent took discriminatory action against its employee Eby because of his activity in unionizing the employees. Eby occupied a fore-front position in the discussions about organizing and was markedly active among the employees to that end. At the first organization meet-

ing, he became a member of the shop committee. He also refused to sign the petition circulated by the management, thereby isolating himself as one who preferred the union to which the management had indicated its opposition. That he was singled out for special treatment by the company is evident. At the second employee meeting, which Dedrick called after a majority of the employees had signed union cards, Eby's attendance was deliberately avoided. This, the management accomplished by arranging the meeting for 6:00 P. M. and by having the foreman tell all of the employees to continue work until that time, except Eby, who was told to check out at 5:00 P. M. When he failed to leave at that time, a foreman insisted that he check out, which Eby did at 5:15 P. M. Mosher, also, on several occasions had shown an antipathy toward Eby, which can be attributed only to the latter's efforts to organize the employees. And, finally, within a few weeks after Cederholm's last attempt at a conference with the management, to which we have already referred, Eby's hourly rate of pay was reduced, although that of the other employees was not; and two months later he was discharged. This action takes on added significance when it is observed that Eby was one of the company's most skillful workmen. The satisfactory character of his work had prompted favorable comment by his superiors; and he was the only employee under the grade of foreman who had been used as an instructor for other employees. Moreover, the reason ascribed by the respondent for Eby's discharge, namely, that they wanted only employees from Red Lion, was inapplicable. Eby lived in Red Lion when he was discharged and had lived there for several months preceding. The Board, therefore, acted properly in ordering Eby's reinstatement as an employee and in directing that the respondent make him whole for his loss due to the reduction in his rate of pay and to his ultimate discharge down to the offer of reinstatement.

 The Board's order, however, requires modification in its provision for making whole Eby's loss. So much of the order as provides that, from the amount otherwise due Eby, the respondent shall deduct such sums as Eby may have received from federal, state, municipal, or other work-projects and shall pay over the amount so deducted to the appropriate public fiscal agency must be excised. It was beyond the power of the Board to so order. Republic Steel Corporation v. National Labor Relations Board et al., 311 U.S. 7, 61 S. Ct. 77, 78, 79, 85 L.Ed. ——. Accordingly, the provisional clause in sub-paragraph (c) of paragraph 2 of the Board's order, toward the end thereof, beginning with the words "deducting, however" and ending at the close of the sub-paragraph, will be deleted.

As modified in conformity with this opinion, the Board's order will be enforced, for which purpose a form of decree may be submitted.

GOODRICH, Circuit Judge (dissenting in part).

Our dissent in this case is to the same point as that raised in the Oughton case decided this day and referred to in the majority opinion. It seems to us that the question of the existence of union membership in a majority of the employees of a given employer at the time of a hearing concerning unfair labor practices is a relevant question. The trial examiner evidently considered it relevant to the extent that he received testimony tending to prove that the relinquishment of union membership in this case was due to unfair labor practice on the part of the employer. But testimony offered to the effect that the employees revoked their authorization voluntarily was rejected. How the testimony is relevant for presentation for one side but not the other is hard to understand. We believe that this conflicting testimony presented an important relevant issue and that the action of the examiner in rejecting it and of the Board in approving the rejection was error.

The majority of the court in stating that the issue presented by the testimony was irrelevant is consistent with the opinion expressed in the Oughton case. The statement of our belief that it was relevant and its rejection arbitrary is consistent with the dissenting opinion in the Oughton case. The dissent in this case presents no new point and the majority opinion obviously settles the rule hereafter to be followed in in this court.

MARIS, Circuit Judge, concurs in this opinion.