## NATIONAL LABOR RELATIONS BOARD v. JAS. H. MATTHEWS & CO.

### No. 9137.

Circuit Court of Appeals, Third Circuit.
Argued May 21, 1946.
Decided Aug. 6, 1946.

Henry Shore, of Pittsburgh, Pa. (David A. Morse, General Counsel, A. Norman Somers, Asst. General Counsel, and Ida Klaus, and Robert E. Mullin, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

W. D. Armour, of Pittsburgh, Pa. (Nicholas Unkovic and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for respondent.

Before MARIS, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This case is before us for enforcement of an order of the National Labor Relations Board[1] against Jas. H. Matthews & Co. The action is brought under the National Labor Relations Act,[2] pursuant to Section 10(e).[3]

The matter of chief interest in the case is the legality of a group called the "Manufacturing Board" or sometimes "Junior Board." The order before us directs its

[1] 63 N.L.R.B. 273.
[2] 49 Stat. 449, 29 U.S.C.A. § 151 et seq.
[3] 29 U.S.C.A. § 160(e).

disestablishment. The validity of this order is strenuously contested by the employer.

The Company had in operation a plan which it called by the pretentious name of "Multiple Management." It called its Board of Directors a "Senior Board." Then it had the "Manufacturing" or "Junior" Board above mentioned. There was also a "Sales Board" and a "Foremen's Board." The latter two are not concerned in this case. This plan of organization was described to the employees in a pamphlet called "Personnel Policies and Partnership Plan."

The Manufacturing or Junior Board was composed of factory employees. That it was set up by the Company was not disputed. The Company bore all the expenses. Its Personnel Department conducted the elections, the Company's Board of Directors approved all the nominees and had the power of removal. Meetings and elections were held on Company property on Company time and Company officers could and did participate in meetings. If this Board is a "labor organization" there is no doubt that it falls within the provision of the statute making it an unfair labor practice to "dominate * * * any labor organization or contribute financial or other support to it * * *"[4].

But the Company says this was not a labor organization. Labor organizations, it contends, make demands, fight, negotiate. We are cited to fourteen characteristics of such organizations that might be found in any standard text book on labor problems. This Junior Board, says the Company, is but a committee of the workers designed to discuss and make recommendations to management about production problems. It follows, the argument runs, the general plan recommended for labor-management committees which were organized to help solve various types of production problems and increase output during the late war and earlier.[5] It may be added that there was a committee of this Junior Board that served just that purpose.

This phase of the case perturbed us considerably at the argument for we were reluctant to reach a conclusion that labor and management cannot confer about production problems without violating the Act. Subsequent examination of the record, however, removes any source of perturbation. The scope of activities of this Junior Board went far beyond that of a labor-management committee. The Board had several committees. One of these was specifically named "The Suggestions and Grievance Committee." There was a "Safety Committee" and a "Personnel Committee" which was to labor for "ever-improving working conditions * * *". The minutes of its meetings show that the Junior Board discussed such matters as the rates of pay, hours of employment, retirement plan, profit sharing system, wage raises, vacation pay, working hour schedules, Saturday work, payday change. Its minutes show consideration and recommendation of at least one discharge case. The statutory definition in the Act with regard to a "labor organization" is "Any organization of any kind, * * * in which employees participate and which exists for the purpose * * * of dealing with employ-

---

[4] 29 U.S.C.A. § 158(2).

[5] The Company states in its brief, and the transcript bears it out, that: "The testimony of Mr. Witte, Respondent's General Superintendent, show that the * * * so-called Junior Boards were organized after he and Mr. Fox, the Respondent's President, had independently read various articles in the Readers Digest and similar publications concerning the McCormick Plan of multiple management. * * * and they decided that a similar plan adapted to the Company's set-up would be an excellent way to better relations between management and the employees and to secure the ideas and suggestions of the employees and thereby contribute to the success of the business."

It is interesting to note that the book to which they refer, Multiple Management by C. P. McCormick, Harpers 1938, contains the following bit of characterization in the Preface: "* * * we have proved that multiple management in the factory not only makes unionization unnecessary, but discourages attempts at union organization." On page 88 in a chapter entitled, "Reasons For The Factory Executive Board" we are further enlightened with the statement that: "There are indications that the plan creates all of the expected benefits and none of the faults of the company union."

ers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."[6] When the activities of the Junior Board are put down beside the statutory definition of a labor organization the conclusion seems pretty clear that the Junior Board fits in perfectly with the Congressional definition.

The missing link, according to argument for the respondent here, is in the word "dealing". Respondent says that this Junior Board did not deal, it only recommended and that final decision was with management. Final decision is always with management, although when a claim is made by a well organized, good sized union, management is doubtless more strongly influenced in its decision than it would be by a recommendation of a board which it, itself, has selected and which has been provided with no fighting arms. We think it clear that the Junior Board was a labor organization, that it was Company-fostered and dominated and that the Board was clearly right in ordering its disestablishment. In so doing we are in no way even suggesting the illegality of a program of labor-management committees.

One phase of the Board's order, however, gives us trouble. A general order prohibiting unfair labor practices was made. We are not impressed in considering this phase of the case by argument made on behalf of the Board that the scope of the order had not been considered by it and is therefore not subject to review here. Respondent did complain that there was no support for the broad order made and it has made that same point in this Court. We are bound to consider it and we do.

There are two phases to this part of the case. Certain anti-union statements were made by three employees named, respec-

tively, Renton, Bachner and Griffin. The statements, as these things go, were not very violent, but they were sufficient to get the Company into trouble if made by people for whose talk it is responsible.

We do not go along with the respondent in the argument that an employer is not liable for anti-union statements which his foremen make. That has already been discussed in the opinions of this Court and we abide by what has been previously said.[7] These men, however, were Assistant Foremen and the evidence shows that they spent at least 80% of their time in working[8] and only the remainder in supervision and direction. The Trial Examiner concluded and the Board adopted the conclusion that these men had supervisory duties "which charge the respondent with their statements and activities". If this were all we had we should perforce be compelled to accept the conclusion although we disagreed with it.

But there is another element here which gives us concern. When an election, held under Board auspices, was being prepared for, a list of eligible voters was drawn up. Renton was included in this list without question. There was objection by Union representatives to the inclusion of Bachner and Griffin, and they were put on a separate list. It was understood that if desired, the Union could challenge their eligibility at the election. The record contains no evidence of such challenge. A circular put out to the factory personnel prior to the election by the Unions, who were seeking recognition, specifically directs a notice to working supervisors telling them and all other employees that the working supervisors were eligible to vote. The arrangements concerning the election and eligibility to vote in it were made under the general supervision of the National Labor Relations Board representative.[9]

---

[6] 29 U.S.C.A. § 152 (5).

[7] National Labor Relations Board v. Condenser Corp., 3 Cir., 1942, 128 F.2d 67; Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 1939, 106 F.2d 254, certiorari denied 308 U.S. 615, 60 S.Ct. 260, 84 L.Ed. 514.

[8] Upon being cross-examined, Mr. Witte, Vice President and General Superintendent of the Company answered "Yes" when asked "And did Mr. LeBus

inform you that in his opinion, and under the Board's rules and regulations, as he interpreted them, that any individual who spent more than 80 percent of his time working with his hands, like his fellow employees, was entitled to vote?" Also see note 9 below.

[9] In cross-examination of Mr. Witte this question was asked: "And was this list prepared after consulting with, and instructions from John F. LeBus, Re-

■ It should be apparent what this set of facts does to the respondent's position under the statute. If an employer seeks to prevent discussion among employees who are about to have an election to determine whether a given organization is to be their bargaining representative, he certainly will get himself into trouble under the Act. We cannot protect the right of these voters to discuss merits or demerits of a particular proposed bargaining agent and in the same breath declare the employer responsible, under the Act, for what these eligible voters say to each other. Of course, it is true that the Board has responsibility for the administration of the National Labor Relations Act and that private individuals cannot interfere with the Board's exercise of its statutory function. But the arrangements for this election were carried on under Board auspices. The men concerned were on the list of voters. We do not think that after the election the Company can be held responsible for what some of those voters have said to each other on the theory that their statements constitute unfair labor practice. The statements of Renton, Bachner and Griffin must, therefore, be rejected as Company responsibility.

This leaves only statements ascribed to William Witte who was Vice-President and General Superintendent of the Company. Of course, he is a man for whose acts the Company is responsible. One thing Mr. Witte did was to cause a notice to be posted and circulated on April 27, 1943. That notice reads as follows:

"To All Employees

"To clarify our position, we do not recognize any union committee as representing our employees, nor are we negotiating a union contract.

"Grievances, questions and suggestions can be brought up in the manner as set up in our Personal Policies and Partnership Plan. Any personal question can be taken up with your supervisor, and through the executives on the organization chart shown on pages 12 and 13 of the booklet.

"Local 15, International Metal Engravers Union and the Machinists Union, affiliated with the A. F. of L. have petitioned the National Labor Board for an election to determine if they are the bargaining agent. This election, when held will enable eligible people to vote as they wish in secret ballot.

"William Witte"

We think this notice is completely innocuous except as to one thing and that one thing has already been considered. The second paragraph quite clearly shows management's position with regard to its Junior Board which was described to the employees in the "Personnel Policies and Partnership Plan" to which reference has already been made. If there were any doubt that the Company regarded and treated this Junior Board as a labor organization the paragraph in this notice would certainly dispel it. But Mr. Witte's notice has no other significance and the phase of the case requiring the Company to disestablish the Junior Board because its maintenance constitutes unfair labor practice has already been dealt with.

■ The other matter charged to the respondent, through Mr. Witte, is that he told an employee named Williams "that they don't want any Union, did not need any Union in there, that they had an organization of their own." We disregard respondent's argument that Williams was unworthy of belief. Credibility of witnesses is certainly not for us in an appellate proceeding. But accepting the statement as made, we think here, as in the notice, the statement has no significance except as tied up with the existence of the "union of their own", that is the Junior Board already fully (perhaps too fully) discussed.

Our conclusion on the whole case is that the Board was clearly right in finding unfair labor practice in Company sponsorship of the Junior Board. We do not find any

---

gional National Labor Relations Board attorney, in the presence of officials of the Company and of the Union?" The list referred to was the voting eligibility list containing the names of Bachner, Griffin and Renton. The answer to the question was "Yes". Further question-

ing revealed that "Mr. Kobre the Field Examiner for the Board" "actually handled the work" with respect to the National Labor Relations Board's agreement to the eligibility list, though Mr. LeBus was present at the discussions and participated in part of them.

support for a conclusion that the Company has committed other unfair labor practice. Therefore, the enforcement decree should be somewhat narrower than that suggested by the Board. An enforcement decree order will be issued, therefore, in accordance with views expressed in this opinion. A decree may be submitted.