# NATIONAL LABOR RELATIONS BOARD *v.* CABOT CARBON CO. ET AL.

No. 329.   Argued March 24, 1959.—Decided June 8, 1959.

*Thomas J. McDermott* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Jerome D. Fenton, Dominick L. Manoli* and *Fannie M. Boyls.*

*Haywood H. Hillyer, Jr.* argued the cause for respondents. With him on the brief were *M. Truman Woodward, Jr., Richard C. Keenan* and *Milton C. Denbo.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

The question for decision in this case is whether "Employee Committees" established and supported by respondents at each of their several plants for the stated purposes of meeting regularly with management to consider and discuss problems of mutual interest, including grievances, and of handling "grievances at nonunion plants and departments," are, in the light of their declared purposes and actual practices, "labor organizations"

within the meaning of § 2 (5) of the National Labor Relations Act.[1]

Respondents are affiliated corporations under the same general management and maintain their principal office at Pampa, Texas. They are, and for many years have been, engaged in operating a number of plants, principally in Texas and Louisiana, primarily for the purposes of manufacturing and selling carbon black and oil field equipment. Pursuant to a suggestion of the War Production Board in 1943, respondents decided to establish an Employee Committee at each of their plants. To that end, respondents prepared, in collaboration with employee representatives from their several plants, a set of bylaws, stating the purposes, duties and functions of the proposed Employee Committees, for transmittal to and adoption by the employees in establishing such Committees. The bylaws were adopted by a majority of employees at each plant and by respondents, and, thus, the Employee Committees were established. Those bylaws, and certain related company rules, were later published by respondents in a company manual called "The Guide," and are still in effect.

In essence, the bylaws state: that the purpose of the Committees is to provide a procedure for considering employees' ideas and problems of mutual interest to employees and management;[2] that each plant Committee

---

[1] Section 2 (5) of the National Labor Relations Act, 61 Stat. 138, 29 U. S. C. § 152 (5) provides:

"The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

[2] Examples of the problems of mutual interest to employees and management to be considered at the Committee-Management meet-

shall consist of a stated number of employees (ranging from 2 to 3) whose terms shall be one year, and that retiring members, with the help of plant clerks, will conduct the nomination and election of their successors; that each plant Committee shall meet with the plant management at regular monthly meetings and at all special meetings called by management, shall assist the plant management in solving problems of mutual interest, and that time so spent will be considered time worked; and that "It shall be the Committee's responsibility to: . . . Handle grievances at nonunion plants and departments according to procedure set up for these plants and departments." [3]

In November 1954, International Chemical Workers Union, AFL–CIO, filed with the National Labor Relations Board, and later several times amended, an unfair labor practice charge against respondents, alleging, in part, that respondents were unlawfully dominating, inter-

---

ings were stated in the bylaws to be, but were not limited to, safety; increased efficiency and production; conservation of supplies, materials, and equipment; encouragement of ingenuity and initiative; and grievances at nonunion plants or departments.

[3] As published in The Guide the established grievance procedure applicable to nonunion plants and departments provides, in summary, that in handling an employee's grievance it shall be the Committee's duty to consult with the Foreman, the Assistant Plant Superintendent and the Plant Superintendent, and consider all the facts. If, after having done so, the Committee believes that the employee has a just grievance it shall prepare in writing a formal statement of its supporting reasons and present it to the Plant Superintendent, who shall send copies of it, attaching his own report and recommendations, to the District Superintendent, the department head and Industrial Relations Department of the company. Within five days after receipt of such grievance the District Superintendent or the department head, or both, shall meet with the Committee and plant management and discuss the problem and announce their decision. If the Committee still feels that the grievance has not been fairly settled it may appeal to the General Manager who, within five days, shall meet with the Committee and plant management and announce his decision.

fering with and supporting labor organizations, called Employee Committees, at their several plants. Thereafter the Board, in April 1956, issued a complaint against respondents under § 10 (b) of the Act (29 U. S. C. § 160 (b)) alleging, *inter alia,* that the Employee Committees were labor organizations within the meaning of § 2 (5, (see note 1), and that respondents, since May 1954, had dominated, interfered with, and supported the Committees in violation of § 8 (a)(2) of the Act.[4]

After a hearing, the trial examiner issued his intermediate report containing detailed findings of fact. The relevant findings, mainly based on undisputed evidence, may be summarized as follows: The Committees' bylaws were prepared and adopted in the manner, and contain the provisions, above stated. During the period here involved (from May 1954 to the date of the hearing before the Board in June 1956), the Employee Committees, in addition to considering and discussing with respondents' plant officials problems of the nature covered by the bylaws, made and discussed proposals and requests respecting many other aspects of the employee relationship, including seniority, job classifications, job bidding, makeup time, overtime records, time cards, a merit system, wage corrections, working schedules, holidays, vacations, sick leave, and improvement of working facilities and conditions. Respondents' plant officials participated in those discussions and in some instances granted the Committees'

---

[4] Section 8 (a) (2) of the Act, 61 Stat. 140, 29 U. S. C. § 158 (a) (2), provides:

"(a) It shall be an unfair labor practice for an employer—

.    .    ..    .

"(2) to dominate or interfere with the formation or administration of any *labor organization* or contribute financial or other support to it; *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 6, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay. . . ." (Emphasis added.)

208.

.requests.[5]    Although not provided for in the bylaws, a "Central Committee," consisting of the chairmen of the several plant Committees, met annually with respondents' Director of Industrial Relations in Pampa, Texas, where, during the 1955 and 1956 meetings, the Central Committee made proposals and requests with respect to many matters covering nearly the whole scope of the employment relationship.[6]    The Director of Industrial Relations discussed those proposals and requests, their feasibility and economic consequences from respondents' point of view, and sought to reach some solution.    In some instances he expressed approval of requests or promised to see what could be done toward meeting them, in other instances he suggested that the matter be taken up with local management, and in still other instances he rejected the proposals and requests and explained his reasons for doing so.

[5] Among other things, respondents' plant officials agreed to Employee Committee requests to change from a company to a plant seniority system in several plants where employees desired the change; to provide longer notice periods concerning jobs up for bid; to permit employees to report early and leave early on week ends; to establish an annual basis for allocating overtime; and to install vents in the roofs of warehouses.

[6] The subjects discussed by the Central Committee with respondents' Director of Industrial Relations at those meetings included Committee proposals and requests for: a vacation of 3 weeks for employees with 10 years' service; annual sick leave; a disability benefit plan; amendments in the practice of working on holidays; the establishment and financing by respondents of an employee educational program; the granting of leaves of absence to employees wishing to attend college; the furnishing to certain employees of work clothing; a change in policy to permit shiftmen to make up work days lost; the creation of more job classifications, with resulting higher wages; more opportunities for employees to transfer from one plant or department to another; payment of wages to employees while attending National Guard camps; making the working day of shiftworkers the same as that of the gangs with which they work; and a general wage increase.

The trial examiner also found that the Employee Committees have no membership requirements, collect no dues and have no funds; that plant clerks assist the Committees in conducting their elections and do all of their clerical work; and that respondents pay all of the necessary expenses of the Committees. None of the Committees has ever attempted to negotiate a collective bargaining contract with respondents. From time to time the Board has certified independent labor organizations as the exclusive bargaining agents for certain bargaining units of employees in approximately one-third of respondents' plants, and, as such agents for those bargaining units, the respective certified labor organizations have entered into collective bargaining contracts with respondents which, as they may have been amended, are still in effect. Since the respective dates of those collective bargaining contracts the certified labor organizations and the Employee Committees have coexisted in those plants, but the functions of those Employee Committees have generally been reduced to plant efficiency, production promotion and the handling of grievances for employees who are not included in the bargaining units.

Upon these findings the trial examiner concluded in his intermediate report that the Employee Committees and the Central Committee are labor organizations within the meaning of § 2 (5), and that during the period here involved respondents dominated, interfered with, and supported those labor organizations in violation of § 8 (a)(2) (see note 4). He therefore recommended that respondents be ordered to cease such conduct, and to withdraw all recognition from, and completely disestablish, the Committees "as the representative of any of [their] employees for the purpose of dealing with Respondents concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." The Board adopted the findings, conclusions and recommendations

of the trial examiner and entered its order accordingly. 117 N. L. R. B. 1633.

Respondents then petitioned the Court of Appeals to review and vacate the Board's findings and order, and the Board's answer sought enforcement of its order. The Court of Appeals denied enforcement of the Board's order and set it aside. 256 F. 2d 281. It found that respondents dominated and supported the Committees but held that they were not "labor organizations" within the meaning of § 2 (5) (see note 1) because it thought (a) that the term "dealing with," as used in that section, means "bargaining with," and that these Committees "avoid[ed] the usual concept of collective bargaining," and (b) that the provisions and legislative history of the 1947 amendment of § 9 (a) of the Act show that Congress, in effect, excluded such employee committees from the definition of "labor organization" contained in § 2 (5). 256 F. 2d, at 285–289. Because of an asserted conflict of that decision with the decisions of other Courts of Appeals, and of the importance of the matter to the proper administration of the National Labor Relations Act, we granted certiorari. 358 U. S. 863.

We turn first to the Court of Appeals' holding that an employee committee which does not "bargain with" employers in "the usual concept of collective bargaining" does not engage in "dealing with" employers, and is therefore not a "labor organization" within the meaning of § 2 (5). Our study of the matter has convinced us that there is nothing in the plain words of § 2 (5), in its legislative history, or in the decisions construing it, that supports that conclusion.

Section 2 (5) includes in its definition of "labor organization" any "employee representation committee or plan . . . which exists for the purpose, in whole or in part, of *dealing with* employers concerning grievances,

labor disputes, wages, rates of pay, hours of employment, or conditions of work." [7]  (Emphasis added.)  Certainly nothing in that section indicates that the broad term "dealing with" is to be read as synonymous with the more limited term "bargaining with."  See, e. g., *Labor Board v. Jas. H. Matthews & Co.,* 156 F. 2d 706, 708, and *Indiana Metal Products Corp. v. Labor Board,* 202 F. 2d 613, 620–621.  The legislative history of § 2 (5) strongly confirms that Congress did not understand or intend those terms to be synonymous.  When the original print of the 1935 Wagner bill (S. 1958) was being considered in the Senate, the then Secretary of Labor proposed an amendment to § 2 (5) which, if adopted, would have given that section the meaning now ascribed to it by the Court of Appeals.  The proposal was that the term "bargaining collectively" be substituted for the term "dealing." [8]  But the proposal was not adopted. [9]  It is therefore quite clear that Congress, by adopting the broad term "dealing" and rejecting the more limited term "bargaining collectively," did not intend that the broad term "dealing with" should be limited to and mean only "bargaining with" as held by

---

[7] "The term 'labor organization' is phrased very broadly in order that the independence of action guaranteed by section 7 . . . and protected by section 8 shall extend to all organizations of employees that deal with employers in regard to 'grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.' This definition includes employee-representation committees and plans in order that the employers' activities in connection therewith shall be equally subject to the application of section 8."  S. Rep. No. 573, 74th Cong., 1st Sess. 7, reprinted in 2 Legislative History of the National Labor Relations Act, 1935, p. 2306.  (The latter publication will hereafter be cited, for example, as 2 Leg. Hist. (1935) 2306.)

[8] Hearings before Senate Committee on Education and Labor on S. 1958, 74th Cong., 1st Sess. 66–67, reprinted in 1 Leg. Hist. (1935) 1442–1443.

[9] S. 1958 (2d print), 74th Cong., 1st Sess. 4, reprinted in 2 Leg. Hist. (1935) 2287.

the Court of Appeals.[10]  Construing § 2 (5) of the original Wagner Act, the Courts of Appeals uniformly·held that employee committees or plans, under whatever name called, that functioned similarly to those here, were "labor organizations" as defined in that statute.[11]  With full knowledge of the terms of § 2 (5) of the original Wagner Act,[12] and of its legislative history and judicial interpretation, Congress in the Taft-Hartley Act re-enacted the section without change.[13]  Since that time, as before, the several Courts of Appeals have uniformly held that employee committees or plans, functioning similarly to those here, were "labor organizations" within the definition of § 2 (5).[14]

The Court of Appeals was therefore in error in holding that company-dominated Employee Committees, which exist for the purpose, in part at least, *"of dealing with* employers concerning grievances . . . or conditions of

[10] See comparison of S. 2926 (73d Cong.) and S. 1958 (74th Cong.), pp. 1, 22–23, reprinted in 1 Leg. Hist. (1935) 1320, 1347.

[11] *Labor Board* v. *American Furnace Co.,* 158 F. 2d 376, 378 (C. A. 7th Cir.) ; *Labor Board* v. *Jas. H. Matthews & Co.,* 156 F. 2d 706, 707–708 (C. A. 3d Cir.) ; *Labor Board* v. *C. Nelson Mfg. Co.,* 120 F. 2d 444, 445 (C. A. 8th Cir.).  Compare *Labor Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 268–269; *Labor Board* v. *Newport News Shipbuilding & Dry Dock Co.,* 308 U. S. 241, 246–248.

[12] 49 Stat. 450.

[13] 61 Stat. 138, 29 U. S. C. § 152 (5).

[14] *Pacemaker Corp.* v. *Labor Board,* 260 F. 2d 880, 883 (C. A. 7th Cir.) (where the Seventh Circuit expressly disagreed with the ruling below) ; *Labor Board* v. *Standard Coil Products Co.,* 224 F. 2d 465, 467–468 (C. A. 1st Cir.) ; *Labor Board* v. *Stow Mfg. Co.,* 217 F. 2d 900, 903–904 (C. A. 2d Cir.) ; *Labor Board* v. *Sharples Chemicals, Inc.,* 209 F. 2d 645, 651–652 (C. A. 6th Cir.) ; *Indiana Metal Products Corp.* v. *Labor Board,* 202 F. 2d 613, 621 (C. A. 7th Cir.); *Harrison Sheet Steel Co.* v. *Labor Board,* 194 F. 2d 407, 410 (C. A. 7th Cir.) ; *Labor Board* v. *General Shoe Corp.,* 192 F. 2d 504, 507 (C. A. 6th Cir.).  But see *Labor Board* v. *Associated Machines,* 219 F. 2d 433· (C. A. 6th Cir.).

work," are not "labor organizations," within the meaning of § 2 (5), simply because they do not "bargain with" employers in "the usual concept of collective bargaining." (Emphasis added.)

Consideration of the declared purposes and actual functions of these Committees shows that they existed for the purpose, in part at least, "of *dealing with* employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." It cannot be, and is not, disputed that, by the terms of the bylaws, which were accepted both by the employees and by respondents, the Employee Committees undertook the "responsibility to," and did, "[h]andle grievances [with respondents on behalf of employees] at nonunion plants and departments according to grievance procedure set up [by respondents] for these plants and departments" (see note 3). It is therefore as plain as words can express that these Committees existed, at least in part, for the purpose "of dealing with employers concerning grievances . . . ." This alone brings these Committees squarely within the statutory definition of "labor organizations."

Moreover, although none of the Employee Committees attempted to negotiate any formal bargaining contract with respondents, the Employee Committees, at the regular Employee Committee-Management meetings held during the period here involved, made proposals and requests respecting such matters as seniority, job classification, job bidding, working schedules, holidays, vacations, sick leave, a merit system, wage corrections, and improvement of working facilities and conditions. Respondents' plant officials participated in the discussion of these matters and frequently granted the Committees' requests (see note 5). Also, during the 1955 and 1956 meetings of the Central Committee with respondents' Director of Industrial Relations in Pampa, Texas, the

Central Committee made proposals and requests with respect to matters covering nearly the whole scope of the employment relationship and which are commonly considered and dealt with in collective bargaining (see note 6). The Director of Industrial Relations discussed those proposals and requests with the Central Committee, and sought to reach some solution. He granted some of them and rejected others, explaining his reasons for doing so. Respondents say that these activities by the Committees and respondents' officials do not mean that the Committees were "dealing with" respondents in respect to those matters, because, they argue, the proposals and requests amounted only to recommendations and that final decision remained with respondents. But this is true of all such "dealing," whether with an independent or a company-dominated "labor organization." The principal distinction lies in the unfettered power of the former to insist upon its requests. *Labor Board* v. *Jas. H. Matthews & Co.*, 156 F. 2d 706, 708.[15] Whether those proposals and requests by the Committees, and respondents' consideration of and action upon them, do or do not constitute "the usual concept of collective bargaining" (256 F. 2d, at 285), we think that those activities establish that the Committees were "dealing with" respondents, with respect to those subjects, within the meaning of § 2 (5).

We therefore conclude that under the declared purposes and actual practices of these Committees they are labor organizations unless, as the Court of Appeals held and as respondents contend, Congress by the 1947 amend-

---

[15] In *Labor Board* v. *Jas. H. Matthews & Co.*, the court said: "Respondents say that this Junior Board did not deal, it only recommended and that final decision was with management. Final decision is always with management, although when a claim is made by a well organized, good sized union, management is doubtless more strongly influenced in its decision than it would be by a recommendation of a board which it, itself, has selected and which has been provided with no fighting arms." 156 F. 2d, at 708.

ment of § 9 (a), in legal effect, eliminated such committees from the term "labor organization" as defined in § 2 (5) and used in § 8 (a)(2) (see note 4). We now turn to that contention.

In 1947 the House passed H. R. 3020, known as the "Hartley Bill," which, among other things, proposed a new section, to be designated 8 (d)(3), providing:

"(d) Notwithstanding any other provision of this section, the following shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act:

"(3) Forming or maintaining by an employer of a committee of employees and discussing with it matters of mutual interest, including grievances, wages, hours of employment, and other working conditions, if the Board has not certified or the employer has not recognized a representative as their representative under section 9." [16]

The Senate amended H. R. 3020 by substituting its own bill, S. 1126, known as the "Taft Bill." [17] The Senate bill contained no provision corresponding to the new § 8 (d)(3) proposed by the House, but it did propose an amendment to § 9 (a) of the original Wagner Act (49 Stat. 453) by adding to the proviso of that section which read:

"*Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer"

the words

"and to have such grievances adjusted, without the intervention of the bargaining representative, as long

---

[16] H. R. 3020, 80th Cong., 1st Sess. 26, reprinted in 1 Leg. Hist. (1947) 183.

[17] S. 1126, 80th Cong., 1st Sess., reprinted in 1 Leg. Hist. (1947) 99.

as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment." [18]

Thereupon the Senate requested a conference.[19] The conferees later reported a new measure, taken partly from the House bill and partly from the Senate bill and containing some entirely new provisions.[20] That bill as finally agreed upon by the conferees did not contain the House's proposed new § 8 (d)(3) or any similar language, but it did contain the Senate's proposed amendment to § 9 (a).

In reporting to the House, the House conferees stated with respect to the elimination of its proposed new § 8 (d)(3) that:

"Section 8 (d)(3) . . . in the House bill provided that nothing in the act was to be construed as prohibiting an employer from forming or maintaining a committee of employees and discussing with it matters of mutual interest, if the employees did not have a bargaining representative. This provision is omitted from the conference agreement since the act by its terms permits individual employees and groups of employees to meet with the employer and section 9 (a) of the conference agreement permits employers to answer their grievances." [21]

---

[18] H. R. 3020, as amended by the Senate, 80th Cong., 1st Sess. 86, reprinted in 1 Leg. Hist. (1947) 244; now 61 Stat. 143, 29 U. S. C. § 159 (a).

[19] 93 Cong. Rec. 5298, reprinted in 2 Leg. Hist. (1947) 1522.

[20] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., reprinted in 1 Leg. Hist. (1947) 505.

[21] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 45, reprinted in 1 Leg. Hist. (1947) 549.

The bill so agreed upon by the conferees was passed by both Houses and eventually became the law.[22]

Notwithstanding the fact that Congress rejected the House proposal of a new section, to be designated § 8 (d)(3), which, if adopted, would have permitted an employer to form or maintain a committee of employees and to discuss with it matters of mutual interest, including grievances, wages, hours of employment, and other working conditions, if there was no employee representative, respondents contend that Congress intended to accomplish the same purposes by its amendment to § 9 (a), and that, in consequence, an employer, whose employees have no bargaining representative, may now legally form or maintain a committee of employees and discuss with it the matters referred to in the proposed § 8 (d)(3) advocated by the House.

This argument treats the amendment to § 9 (a) as though Congress had adopted, rather than rejected as it did, the proposed § 8 (d)(3) advocated by the House. And it overlooks the facts that the House Conference Report itself declared that "The conference agreement does not make any change" in the definition of "labor organization,"[23] and that, as pointed out by Senator Taft, the conferees specifically rejected all attempts to "amend . . . the provisions in subsection 8 (2) [of the original Wagner Act] relating to company-dominated unions" and had left its prohibitions "unchanged."[24] The amendment to § 9 (a) does not say that an employer may form or maintain an employee committee for the purpose of "dealing with" the employer, on behalf of employees, concerning grievances. On the contrary the amendment to § 9 (a) simply provides, in substance, that

---

[22] 61 Stat. 136 *et seq.*, 29 U. S. C. § 151 *et seq.*

[23] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 33, 1 Leg. Hist. (1947) 537.

[24] 93 Cong. Rec. 6600, reprinted in 2 Leg. Hist. (1947) 1539.

any individual employee or group of employees shall have the right personally to present their own grievances to their employer, and to have such grievances adjusted, without the intervention of any bargaining representative, as long as the adjustment is not inconsistent with the terms of any collective bargaining contract then in effect, provided that the bargaining representative, if there is one, has been given an opportunity to be present. It is thus evident that there is nothing in the amendment of § 9 (a) that authorizes an employer to engage in "dealing with" an employer-dominated "labor organization" as the representative of his employees concerning their grievances.

We therefore conclude that there is nothing in the amendment of § 9 (a), or in its legislative history, to indicate that Congress thereby eliminated or intended to eliminate such employee committees from the term "labor organization" as defined in § 2 (5) and used in § 8 (a)(2).

Respondents argue that to hold these employee committees to be labor organizations would prevent employers and employees from discussing matters of mutual interest concerning the employment relationship, and would thus abridge freedom of speech in violation of the First Amendment of the Constitution. But the Board's order does not impose any such bar; it merely precludes the employers from dominating, interfering with or supporting such employee committees which Congress has defined to be labor organizations.

The judgment of the Court of Appeals is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*