SOUTH LOUISIANA CHAPTER, INC., NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, Plaintiff,

v.

LOCAL UNION NO. 130 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, et al., Defendants.

Civ. A. No. 9193.

United States District Court
E. D. Louisiana,
New Orleans Division.
Sept. 25, 1959.

Henican, James & Cleveland, C. Ellis Henican, New Orleans, La., for plaintiff.

Cassibry, Jackson & Hess, Fred J. Cassibry, New Orleans, La., for defendants.

**J. SKELLY WRIGHT, District Judge.**

This suit by an employers' association asks that a certain trust agreement between it and a labor union be declared null and void, and that the labor union and the trustees of the fund provided for in the agreement be enjoined from receiving or disbursing any moneys under the trust agreement. It asks further that the trustees be required to give an accounting of the money in the fund, to the end that all contributors thereto be reimbursed their pro rata share.

Jurisdiction is based upon the authority of the district courts to adjudicate "any civil action or proceeding arising under any Act of Congress regulating commerce." 28 U.S.C. § 1337. The Union and the employers' group are engaged in an industry affecting interstate commerce; hence jurisdiction is also supported by 29 U.S.C.A. § 185(b), permitting any labor organization which represents employees in an industry affecting commerce to sue or be sued in the courts of the United States.

Plaintiff predicates its action on Section 302 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 186. That section makes illegal, and criminal, the giving by an employer anything of value to any representative [1] of his employees. Plaintiff contends that the trust agreement between the employers' association and the local union violates this section of the Act.

The trust agreement was originally entered into January 14, 1957. It provided that there be established a fund for the training of apprentices in the electrical industry and the improvement of the skills of journeymen. The fund was to be entirely supported by contributions of 1½ cents per man hour worked for all employer-members of the South Louisiana Chapter, Inc., of the National Electrical Contractors Association, and any other employer who signed the trust agreement. Although other employers contributed to the fund, only plaintiff Association has signed the trust agreement.

Originally the fund was to be administered by a board of eight trustees, four selected by the Association and designated "employer trustees" and four chosen by the Union, to be designated "union trustees." Each trustee was to serve for one year. The Board would choose its own chairman. Decisions were to be made by a majority of the members. In case of deadlock, a neutral person acceptable to both groups of trustees was to be consulted. If none was found acceptable, the senior judge of the

---

1. Section 101 of the Act reads:
   "The term 'representatives' includes any individual or labor organization." 29 U.S.C.A. § 152(4).
   In 29 U.S.C.A. § 152(5), "labor organization" is defined as follows:
   "The term 'labor organization' means any organization of any kind, or any

agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

federal district court was to appoint an umpire. Trustees received no compensation but were reimbursed reasonable expenses. Six trustees constituted a quorum, the decisions of which were determined by majority vote.

In November 1957, the Court of Appeals for the Ninth Circuit, in Sheet Metal Contractors Ass'n of San Francisco v. Sheet Metal Workers International Association, 9 Cir., 248 F.2d 307, declared that a trust fund administered by a joint labor-management board and which, among other purposes, financed an apprenticeship program, was in violation of 29 U.S.C.A. § 186. The decision evoked some apprehension about the legality of the trust agreement between Local 130 and the plaintiff Association, and early in 1958 there occurred an exchange of letters among spokesmen for the Union, the Association, and the U. S. Department of Labor, the consequence of which was a hope and eventually the conviction that designation of a bank as trustee of the apprenticeship training funds would make the program less suspect. Eventually, on June 17, 1959, the Union and the Association, through their respective trustees of the New Orleans Electrical Joint Apprenticeship Committee and Training Fund, named the National Bank of Commerce as trustee for the receipt and disbursement of all funds connected with the apprenticeship training program. Two of the employer trustees were named chairman and treasurer of the Committee and Training Fund, and a member of the Union was named secretary-coordinator. The bank could only disburse money from the training fund upon written request of two of the above three officials.

Meanwhile, the collective bargaining agreement regulating working conditions for Union employees of the plaintiff Association members approached its expiration date, June 30, 1959. It was not renewed because the Association refused to accede to the Union's new demands. A strike ensued.

This suit was filed July 14, 1959, ostensibly to test the validity of the trust agreement. It is apparent, however, that while the validity of the agreement may have excited some anguish on the part of the Association, its use as a possible weapon with which to break the strike did not escape the attention of either Association officials or their counsel.[2] The testimony of Elgutter and

2. In a deposition taken August 3, 1959, William Weisfeld, one of the four employer trustees and a disbursing authority for the training fund under the new arrangement with the bank, testified concerning a chapter meeting held by the Association about two weeks after the strike began:

"Q. Was the decision made at the hearing to attack the plan in court? A. There was no decision made at that meeting. It was just a report of what had been done prior to the meeting.

"Q. What the gist of the report of what had to be done, or had been done? A. Well, there was no written report. I personally brought up the question and asked why we were attacking the apprenticeship program. I considered it a very worthwhile endeavor. I considered it a very worthy cause. It was the lifeline of our industry. I brought that up from the floor.

"Q. What answer did you get? A. The answer seemed to be that in war, any object is attacked.

"Q. I would like for you to remember exactly what was said. Just try to remember as best you can, the exact language that was used by whoever said it. A. Well, to quote myself, I made the remark that I didn't see why we were attacking the only thing that is of any value to us, that would improve our industry. I made the remark, if you are attacking something, anything that you can strike and lash out at, you are really kicking a baby. The answer was, when I am mad at the daddy, I am going to kick the baby.

"Q. Who said that? A. Mr. P. D. Lambert.

"Q. Who is Mr. P. D. Lambert? A. He is another contractor on the negotiating board.

"Q. The negotiating board of the N.E. C.A.? A. Yes, sir."

Further in the deposition is the following colloquy:

"Q. Did you ask that question in the meeting, why the suit was filed after

Weisfeld, both members of the plaintiff Association, makes it quite clear that the motive for filing this suit was not so much concern for the validity of the trust agreement, since only a month earlier the Association and the Union had gone to great pains to correct what they thought might be vulnerable conditions in the pact, but was rather a strategic maneuver in a labor dispute. Regardless of the motive, however, the legality vel non of the trust agreement must still be determined.

■ At the outset, it would appear that a number of contractors, not members of plaintiff Association, who contributed to the fund to train apprentices and improve the skills of journeymen, should be made parties. On closer analysis, however, since the legality of the trust agreement is the issue in suit, and since the plaintiff and defendants here are the only signatories to that agreement, this issue may be resolved without prejudice to the contractors who merely contributed to the fund. Haby v. Stanolind Oil and Gas Company, 5 Cir., 228 F.2d 298; Mackintosh v. Marks' Estate, 5 Cir., 225 F.2d 211. A further issue

in the case, the question of the disposition of the fund in the event the agreement is held illegal, may require additional parties. However, as will appear, this second issue is not reached.

Defendants raise the issues of laches and the doctrine of "unclean hands," claiming that the Association's conscious assent to an allegedly illegal agreement estops it from complaining about its illegality. They contend that the Association's bad faith is also amply demonstrated by its use of a lawsuit as a labor weapon. Plaintiff takes the position that even though parties to an illegal contract are in pari delicto, courts will grant affirmative relief to one or the other when public policy requires. Here, according to plaintiff, the public has such an interest that a court is justified in granting relief, including reimbursement to the contributors to the fund their pro rata share.

The demand that a court of equity distribute the alleged illegal fund to those who have knowingly contributed to it is indeed a strange one. Under Section 302 of the Act,[3] if the fund is illegal, the contributors have committed a crime

---

the strike began, rather than before? A. I didn't ask that question.

"Q. You have never asked—you did not ask, in this meeting, the specific question as to why this suit was being filed? A. I did and I was told it was told (sic) it was just an object being attacked in a war. Someone said that during a bombing raid sometimes the hospital is hit.

"Q. Who said that? A. It is a regrettable incident.

"Q. Who said that, Mr. Weisfeld? A. Mr. Henican."

In the deposition of Michael S. Elgutter, manager-secretary of the plaintiff Association, taken at the same time as that of Mr. Weisfeld, Elgutter testified:

"Q. Did you hear Mr. Henican talking about the bombs and something said about hitting a hospital? A. I heard Mr. Henican.

"Q. He did say that? A. Yes, sir.

"Q. In response to what was that said? A. Mr. Weisfeld remarked what a terrible thing it was to try to get this matter to come up at this time, because of the fact Local 130 decided that they

would strike, and Mr. Weisfeld brought that issue forward."

Weisfeld also testified that the decision to attack the training fund was made at an earlier meeting and that he had voted against the attack.

"A. I remember that I voted against it. I figured nothing—it was nothing but a smoke screen and I still think so."

At the later meeting, according to Elgutter, the contractors apparently decided to use any excuse they could find to harass the Union with a lawsuit.

"A. They passed the resolution at that meeting that we would sue on anything and that was without (sic) our right, and we discussed what position we were in where Local 130 had chosen to strike rather than to continue negotiations.

"Q. So, you decided to sue on anything that you could sue on and what did you finally decide, that this was the only thing that you could file suit on? A. Up to this time, that is correct."

3. See 29 U.S.C.A. § 186(a) and (d).

punishable by fine and imprisonment. Under those circumstances, a court of equity could hardly be expected to return to the criminal participants in the fund the evidence of their crime. Since this Court finds that the trust agreement here in suit is not illegal, it becomes unnecessary to consider further the defense of unclean hands.

■ Joint industry boards created by areawide bargaining groups are recognized as mutually beneficial and socially desirable. Despite certain adverse interests, employers and employees have mutual goals which may more readily be achieved by cooperative effort. The training of apprentices is certainly one of these goals and it is the sole purpose of the trust agreement in suit to further this mutual program. This agreement did not invade other areas of labor-management relations and require the joint board to perform the functions of a labor organization. See 29 U.S.C.A. § 152(5); compare National Labor Relations Board v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175. It is restricted to setting up a trust fund for the training of apprentices. Consequently, this trust agreement can readily be distinguished from the agreements held illegal, in the cases cited by plaintiff,[4] as violative of Section 302(a) of the Act. 29 U.S.C.A. § 186(a).

In all of the cases on which plaintiff relies, the accused agreements covered other areas of labor-management relations. They were not restricted to a single mutually beneficial program such as the training of apprentices. They provided for the creation of boards which performed the functions of a labor organization. In both the Conditioned Air and Sheet Metal cases, supra, decided by the Ninth Circuit, the boards, in addition to other duties, engaged in bargaining functions for the employees.

In Mechanical Contractors, supra [265 F.2d 609], the other case on which plaintiff relies, the joint board was required to maintain "facilities for arbitration and adjustment of grievances." These cases, applying the term broadly, all held that the boards there in suit were labor organizations, and therefore representatives of employees, within the meaning of the Act. In Mechanical Contractors, supra, the Court also stated that an employee-designee on the joint board was a "representative" within the meaning of Section 302(a). The fact remains, however, that, as long as such "representative" does not receive from the employer "any money or other thing of value," there is no violation of Section 302. Here there is no such showing. Quite the reverse. No compensation is paid to the members of the board for their services.

Actually, the decisions in plaintiff's cases result, to some extent at least, from a misreading of the Supreme Court's opinion in United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335, and a misinterpretation of the intent of Congress in barring payments by an employer to "any representative of * * * his employees." 29 U.S.C.A. § 186(a). In Ryan, the president of a union accepted a bribe from management. His defense to a prosecution under Section 302(a) was that the term "representative" in Section 302 was restricted to the exclusive bargaining representative of the Union. The Supreme Court rejected this narrow interpretation because to do so would frustrate the intent of Congress in passing Section 302.

■ The legislative history of Section 302 makes clear that Congress had in mind, in addition to the protection of welfare funds, outlawing payment of bribes by management to representa-

4. Mechanical Contractors Association of Philadelphia, Inc. v. Local Union 420, 3 Cir., 265 F.2d 607; Plumbing & Pipe Fitting Labor-Management Relations Trust v. Conditioned Air & Refrigeration Co., 9 Cir., 253 F.2d 427; Sheet Metal Contractors Ass'n of San Francisco v. Sheet Metal Workers International Association, supra.

tives of employees, and extortion of employers by such representatives. See 93 Cong.Rec. 3562–66, 4746–8. See also 10 Stanford L.Rev. 374. In seeking to apply the language of Section 302 literally, this legislative purpose was disregarded in the cases on which plaintiff relies, particularly in Mechanical Contractors, supra. Congress, therefore, has been required to spell out its intent in order that courts will not strike down, as illegal, labor and management-agreements, such as the one in suit, which promote harmony in an industry and redound to the benefit of employer and employee alike. Congress, in the Labor Management Reform Act of 1959, has now made clear what these cases have misconstrued in the Labor Management Relations Act of 1947. Congress has now specifically exempted from the operation of Section 302 labor-management agreements which would set up a trust fund for the training of apprentices, § 505, Labor Management Relations Act of 1959, 29 U.S.C.A. § 186(a–c).

Motion of defendant for summary judgment granted.