SIMMONS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 5730.

United States Court of Appeals
First Circuit.

March 10, 1961.

Eduardo Negron Rodriguez, with whom Fiddler, Gonzalez, Guillemard & Rodriguez, San Juan, P. R., was on brief, for petitioner.

Melvin J. Welles, Attorney, with whom Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Russell Specter, Attorney, Washington, D. C., were on brief, for respondent.

Before MAGRUDER, HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is a petition for review of an order of the NLRB dismissing a complaint based upon a charge by an employer, Simmons, Inc., petitioner herein, engaged in manufacture and sale in interstate commerce in San Juan, Puerto Rico, that a committee composed of certain of its employees, collectively known as the Comite, had violated section 8(b) (4) (C) of the National Labor Relations Act.[1] The first question is whether the Comite was a "labor organization." It

---

1. "(b) It shall be an unfair labor practice for a labor organization or its agents

—* * * (4) to engage in, or to induce or encourage the employees of any employ-

is, of course, clear that it could be. See 29 U.S.C.A. § 152(5); N. L. R. B. v. Cabot Carbon Co., 1959, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175. Whether it was in fact will depend on what, on the dates in issue, it attempted to do. If within the meaning of the act it sought to have itself recognized or bargained with, then it acted as a labor organization.

The employees comprising the Comite were Pacheco, Gambaro, Garcia, Burgos and Aviles-Padilla. The Trial Examiner found that all except Aviles-Padilla [2] induced a strike of petitioner's employees on March 23, 1959, for the purpose of forcing it to recognize the Comite as the representative of its employees when another organization had been certified, and recommended an order. Petitioner also charged that the Puerto Rico local of the Teamsters' Union was in similar violation, but the Trial Examiner found this charge not supported. On review the Board reversed the findings against Pacheco, Gambaro, Garcia and Burgos, but otherwise affirmed, and ordered the complaint dismissed.

■■ With respect to the Teamsters we are satisfied that there was a clear issue of fact, and we will not consider the question further. N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, 887. The charge against the Comite is another matter. To the extent that the findings and conclusions of the Board with respect to the Comite members differ from those of the Trial Examiner, we find them unsupportable (with minor exceptions of no relevance here).

In spite of the relatively few areas of disagreement, we must summarize the events at some length. In 1957 Simmons signed an agreement expiring January 31, 1959, with a union known as the Mattress Workers. In 1958 a number of Simmons employees sought to interest the Seafarers International Union (SIU) in representing them. In December of that year the SIU held a membership meeting at which a committee, composed of the five previously named (and two others who later resigned), was elected.[3] Its duty, "with the assistance of the officers of the SIU was to prepare and negotiate the agreement with the Simmons Company" to succeed the Mattress Workers' contract. Pacheco, Gambaro and Burgos were officers of the Mattress Workers, but that union was, in effect, moribund. When Simmons refused to recognize the SIU without an election, an election was held, and the SIU was certified on March 5, 1959.

Apparently the certification induced the SIU officials to disregard the Comite. Without any notice to it, they held four meetings with the petitioner. The discussion at these meetings revolved around a contract presented by the SIU officials, and not one previously submitted by the Comite. On Friday, March 20, the four Comite members learned of a meeting scheduled for that day and attended. From the start the Comite quarreled with the SIU, and delayed until the end of the day in even provisionally agreeing (pending completion of the full agreement) to the recognition clause— naming SIU, only—, and to the check-off clause—under which the SIU and not "their treasury" (the Mattress Workers' treasury) would receive the dues.[4]

The Trial Examiner found that at the

er to engage in, a strike * * * where an object thereof is: * * * (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title." 29 U.S.C.A. § 158(b) (4) (C).

2. Aviles-Padilla, though a member of the Comite, was absent and did not participate in the activities of March 20–23, the significant days. Hereinafter when we refer to the Comite on those days it will not include him.

3. Terpe, local president of SIU, testified that none of the five were, or became, members of SIU, but Gambaro contradicted this. Neither the examiner nor the Board resolved this conflict.

4. This is a matter of some significance. Gambaro testified that these funds were

outset of this meeting the SIU officials told the Comite that an agreement was going to be signed that afternoon. Manifestly that did not eventuate. Indeed, the important issue of wages did not even reach the discussion stage because of the disagreements over formal matters. The Trial Examiner did not resolve a conflict between Gambaro and Terpe whether, according to Gambaro, petitioner said that if the contract was not signed "that night," there would never be one. However, he did find that "the meeting broke up [at 10 P.M.] without a complete contract having been agreed upon, and another negotiation session was scheduled for Monday, March 23." This was apparently the final event of that evening.[5]

On March 21 the Comite released a highly critical attack on the SIU for publication in the newspapers. On Monday, March 23, members of the Comite appeared early at the plant and talked with the other employees, who immediately went on strike and began picketing, carrying posters in various forms, but of the general tenor that the SIU had sold them out. Gambaro and Garcia then went to the office of one Bosch, a former president of the SIU, and an experienced labor lawyer, but not then connected with the SIU. Together they drafted the following telegram, which was sent over Gambaro's signature to the petitioner.

"We Are On Strike During This Day In Order To Reject Agreement Negotiated By S. I. U. Representative. We Demand Our Committee Be Recognized To Negotiate Contract."

The Trial Examiner found that the Comite adopted this telegram and that it induced the strike.

Upon receipt of the telegram petitioner notified the SIU officers, who then went to the plant and told the striking employees that no contract had been signed, or even "negotiated," and the employees thereupon abandoned the strike. As March 23 was a half-holiday they did not go back to work. That same afternoon petitioner filed the present charge.

On the morning of March 24 petitioner summoned all five Comite members to its office and discharged them. Later that day all except Aviles-Padilla sent petitioner the following telegram.

"Upon Action Taken By Us Workers Resumed Work Today.[6] We Abrogate And Withdraw Previous Telegram Upon Clarification Of Negotiation Situation. Bargaining Committee Ready To Resume Negotiations On Behalf S. I. U. With Attendance And Assistance Of S. I. U. Leaders To Which We Are Affiliated."

Petitioner refused to reemploy the five Comite members and on March 25 a strike was called which terminated only after an injunction was issued by the district court.[7]

At the hearing before the Trial Examiner the Comite contended that the original telegram did not mean that they wished to be the sole bargaining representatives, but only that they wished to participate with the SIU officials. The Trial Examiner rejected this, finding that although the Comite had previously been simply "an arm of the SIU," by its telegram of March 23 it sought to act as an "exclusive bargaining representative." It was on this point that the Board reversed, holding that the March 23 telegram was merely "an in-

waiting to be turned over to the SIU, but not "until we joined fully."

5. The Board made an additional finding that the Comite "came away from the meeting on March 20 convinced that an agreement * * * had been, or was about to be, executed without their approval." We will assume that this finding was warranted, although we have

some doubts about it. If it was not, there is even less basis for the Board's decision, for in such event the Comite was thereafter being obstreperous in bad faith.

6. This sentence was patently false.

7. Petitioner contended that this second strike was also in violation of section 8

artfully worded demand for inclusion * * * in the contract negotiations."

We need not decide the question of whether, standing alone, the March 23 telegram can be construed as demanding only joint recognition. While the word "exclusive" was not used, it may be wondered to what extent "negotiate" means to participate as a subordinate,[8] particularly coming immediately after a rejection of action "negotiated" by the superior. Nor is this a case of a document drafted by an unskilled layman. However, the telegram did not stand alone. There were important other guides. If this telegram demanded only joint recognition, what was there to "abrogate and withdraw" by the second? Or what reason to say, on March 24, that the Comite was "ready to resume negotiations * * with attendance and assistance" of SIU officers,[9] if on March 23 that was already its position? The Board makes no answer to this.

Furthermore, one cannot disregard the Comite's unusual features and history. Three of the present four members, when elected, were officers of the union still having an unexpired collective bargaining agreement with the petitioner. According to Terpe's testimony (unresolved, although it would seem that he should know more about the matter than Gambaro), they were not even SIU members. Whatever the Comite's legal status, it fell considerably short of the constitutional body in General Shoe Corp., 1958, 120 N.L.R.B. 911, on which the Board

relied. Its apparent initial purpose was to effect a peaceful changeover to the SIU. When this could not be accomplished without an election, the SIU's interest in the Comite noticeably declined. As already pointed out, it was bypassed and ignored.

On its side, the Comite was equally uncommitted. If it was an internal part of SIU, why should it object to the recognition clause, or to the check-off clause? Why the separate treasury? Gambaro himself supplied the answer. They had not yet "fully joined." Nor was the newspaper release vigorously attacking the SIU, or the picketing placards announcing that the SIU had sold them out, any more compatible with integral affiliation.

We will assume with the Board, without deciding, that a demand to be recognized as a joint bargaining arm of a certified labor organization does not violate section 8(b) (4) (C), and that this is so even when the certified organization and its "arm" apparently represent somewhat divergent views. But by March 23 we can only regard that divergence as having passed the breaking point. On March 23 the Comite had become fully exasperated, and was declaring its independence. We cannot construe the record otherwise.

A decree will be entered vacating the order of dismissal and remanding the action to the Board for the entry of an order consistent with this opinion.

---

(b) (4) (C), but this matter was found against it on adequate evidence.

8. It seems clear that after certification of the SIU the Comite could not assert a paramount role on the ground that it had been elected to represent the employees. See Brooks v. N. L. R. B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed.

125; cf. Douds v. Local 1250, Retail Wholesale Department Store Union, Etc., 2 Cir., 1949, 173 F.2d 764, 9 A.L.R. 2d 685.

9. It may be noted that even here the Comite designated the SIU for the subordinate role.