**SAHARA DATSUN, INC.,**
**Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent-Cross-Petitioner.**

Nos. 86–7382, 86–7438.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1987.

Decided March 3, 1987.

Norman H. Kirshman, Los Angeles, Cal., for petitioner-cross-respondent.

William R. Stewart, Washington, D.C., for respondent-cross-petitioner.

Before FERGUSON, NELSON and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Automobile salesmen at Sahara Datsun (the Company) sought the representation of the Liberated Workers Welfare (LWW) and petitioned the National Labor Relations Board (Board) for a representation election. The Company responded to the petition by discharging key union proponents, threatening to discharge and blackball other union supporters, and coercively interrogating employees concerning union matters. The subsequent representation election resulted in a tie and the LWW filed unfair labor practice charges with the Board. The Board found that the Company violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act (NLRA) and ordered the Company to cease and desist from the unfair labor practices. Additionally, the Board ordered the Company to recognize and bargain with the LWW. We grant the Board's petition for enforcement.

# I

## FACTS

The Company sells and leases automobiles in Las Vegas, Nevada. It employs fourteen salesmen and several sales and lease managers.

In 1982, Mark Darata, a salesman employed by Sahara Datsun, formed the LWW. During the following two years the union conducted its business informally, holding only three or four membership meetings. In August 1984, Darata spoke with salesmen at Sahara Datsun and urged them to obtain the representation of the LWW. Darata and Venckus, another salesman, held organizational meetings at Venckus' residence. Twelve of the fourteen company salesmen signed authorization cards at these meetings.

After obtaining authorization cards from a majority of the salesmen, Darata filed a representation petition with the Board. The Company received a copy of the petition on September 13, 1984. That day the Company's sales manager discharged Darata and Venckus[1] and interrogated other employees on union matters. The next day a sales manager informed a group of salesmen that union adherents would be fired and blackballed by other automobile dealerships in Las Vegas. During the following week, the Company unilaterally instituted a system of issuing written notices for rule infractions and discontinued its long-established policy of offering bonuses to salesmen. Additionally, the Board found that a Company official refused to approve a salesman's credit application unless the salesman voted against the LWW in the upcoming representation election.

The Board also found that Darata unlawfully retaliated against the Company, thereby forfeiting his right to reinstatement and his right to represent the LWW in negotiations with the Company. Specifically, the Board found that on October 19, 1984, Darata contacted a bank loan officer

who does business with the Company and wrongfully accused the Company of falsifying its credit applications. Moreover, in January 1985, Darata circulated a newsletter in which he accused company officials of illegal drug use and solicitation of prostitutes.

# II

## NLRB PROCEEDINGS

In response to LWW's election petition, the Board's regional director designated the Company's new and used car salesmen as the appropriate bargaining unit and ordered an election. The election resulted in a 6–6 tie with four challenged ballots. The LWW filed objections to the election. The election challenge was consolidated with the LWW's unfair labor practice claim in proceedings before an administrative law judge. The ALJ found that the Company violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the NLRA.

The NLRB affirmed in part and modified in part. The Board's order requires the Company to cease and desist from the unfair labor practices. The Board's order also requires the Company to recognize and bargain with the LWW.

# III

## ANALYSIS

The Company contends that the LWW is not a labor organization under the NLRA and that the Company was wrongfully precluded from relitigating the LWW's status in the unfair labor practice case. The Company also asserts that the Board's bargaining order is improper. Finally, the Company argues that it was denied due process when the ALJ precluded cross-examination of union witnesses on the subject of drug use at organizational meetings.

The NLRB's order will be upheld only if it applied the substantive law correctly. *NLRB v. Island Film Processing Co.,* 784

---

1. Venckus was immediately rehired. However, Company officials threatened to discharge him again if they discovered he supported the union.

Venckus was terminated several months later for attempting to sell cocaine to employees.

F.2d 1446, 1450 (9th Cir.1986). The Board's factual findings are conclusive if supported by substantial evidence in the record. 29 U.S.C. § 160(e).

### A. The Liberated Workers Welfare Is a Labor Organization Within The Meaning of Section 152(5)

Labor organizations are defined in the NLRA to include "any organization of any kind ... in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages...." 29 U.S.C. § 152(5). In *NLRB v. Cabot Carbon Co.*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959), the Supreme Court construed the statutory definition broadly to encompass "employee committees" established by management. The Court held that an institution could qualify as a labor organization under the NLRA without ever having negotiated a formal collective bargaining agreement. *Cabot Carbon Co.*, 360 U.S. at 213, 79 S.Ct. at 1022.

■ Since *Cabot Carbon Co.*, the NLRB has consistently construed the statutory definition of "labor organization" liberally. Thus, organizations without written constitutions, by-laws, dues or initiation fees are labor organizations within the meaning of the NLRA if they are organized, at least in part, for the purpose of negotiating with an employer over grievances, wages or other terms and conditions of employment. *See Armco, Inc.*, 271 N.L.R.B. 350 (1984); *American Automobile Association*, 242 N.L.R.B. 722 (1979). *See also Local No. 2 of the Operative Plasterers and Cement Masons Int'l Assoc. v. Paramount Plastering, Inc.*, 310 F.2d 179, 187 (9th Cir. 1962), *cert. denied*, 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963). ("If it existed, even in small part, for the purpose of dealing with employers concerning grievances or disputes, or conditions of work, it was a 'labor organization' within the 29 U.S.C. § 152(5) definition....")

■ The regional director found that the LWW is a bona fide labor organization. In support of his finding, the regional director determined that the LWW was established in 1982 by Darata and several other individuals. The LWW held three or four informal meetings between 1982 and 1984. According to the regional director, the LWW existed in part for the purpose of dealing with employers concerning grievances and working conditions. The ALJ and the Board both adopted the regional director's finding.

The Company asserts that Darata created the LWW with the intent of using the organization as a platform, from which he could malign and attack the Company. This contention finds no support in the record. There is no evidence of animus by Darata against the Company until after his discharge in September 1984. The LWW was organized, held meetings and obtained the majority support of the salesmen at Sahara Datsun prior to Darata's discharge. Accordingly, the record supports the regional director's conclusion that the LWW was formed for legitimate purposes. The LWW is, no doubt, a fledgling institution. However, its lack of organization, history and financial support are not determinative. The requirements for qualifying as a labor organization pursuant to 29 U.S.C. § 152(5) are slight and we conclude they are easily met here.

■ The Company also argues that the Board and the ALJ committed prejudicial error by preventing the Company from relitigating the status of the LWW in the unfair labor practice case. According to the Company, it was entitled to present evidence to the ALJ and the Board which would demonstrate that the LWW was not a labor organization under the NLRA.

Section 3(b) of the NLRA, 29 U.S.C. § 153(b), authorizes the Board to delegate to its regional directors the power to determine the appropriate unit for collective bargaining. Pursuant to this delegation of authority the Board enacted the "rule against relitigation", codified at 29 C.F.R. 102.67. Under this rule certain issues decided by regional directors in representa-

tion proceedings are reviewable only at the Board's discretion in subsequent "related" unfair labor practice proceedings. *See generally* Note, *The Permissible Scope of the National Labor Relations Board's Rule Against Relitigation,* 69 Mich.L.Rev. 569 (1971). Here, the Board invoked the rule against relitigation and declined to hear evidence on the LWW's status as a labor organization.

In *Magnesium Casting Co. v. NLRB,* 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971), the Supreme Court ruled that the Board could, within its discretion, decline to relitigate a regional director's determination that certain individuals were "employees" under the NLRA. The Court stated that "regional directors have an expertise concerning unit determinations," 401 U.S. at 141, 91 S.Ct. at 601, and Board deference to that determination was appropriate.

Similarly, a regional director has expertise in determining if institutions are labor organizations within the meaning of the NLRA. The regional director's findings on labor organization status are conclusive unless there is a compelling justification for Board review. Here, the Board concluded that relitigation of the issue was unnecessary. We defer to the Board's determination. If the Board is required to relitigate issues as fundamental as labor organization status, the congressional delegation of authority to regional directors in 29 U.S.C. § 153(b) will be rendered largely meaningless.

■ The Company also asserts that the subsequent unfair labor proceeding was not "related" to the representation hearing and thus not within the purview of the rule against relitigation. This claim is meritless. The consolidated proceeding before the ALJ was a continuation of the representation case heard by the regional director. Both cases addressed, among other things, the central issue of whether the union had attained majority status. Additionally, we note that courts have consistently held that section 8(a)(5) refusal-to-bargain-cases are "related" to prior representation proceedings. *NLRB v. W.S. Hatch Co.,* 474 F.2d 558, 562 (9th Cir.1973); *Amalgamated Clothing Workers of America v. NLRB,* 365 F.2d 898, 904 (D.C.Cir. 1966). The LWW alleged, and the Board found, that the Company violated section 8(a)(5). The presence of additional unfair labor practice claims does not destroy the relationship between the representation proceeding and the subsequent unfair labor practice case and in no way necessitates relitigating the labor organization issue. Thus, the representation hearing and the unfair labor practice case are "related" and governed by the rule against relitigation.[2]

**B. The Board's Bargaining Order Is Warranted Under Gissel**

■ Typically, unions demonstrate majority support through NLRB election and certification proceedings. In some instances, however, the Board will require an employer to recognize and bargain with a union which has never achieved a majority in a Board election. In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the court concluded that, in the face of pervasive unfair labor practices, a bargaining order is appropriate when the union has majority support, evidenced by authorization cards, prior to the commission of the unfair labor practices. *Id.* at 614–15, 89 S.Ct. at 1940.

A *Gissel* bargaining order is appropriate here. Twelve of the fourteen salesmen signed authorization cards at an organizational meeting in early September, 1984.[3]

**2.** We note in passing that, contrary to the Company's assertion, no evidence was presented before the ALJ that undermined the LWW's status as a labor organization.

**3.** The Company contends that the authorization cards are invalid because they are ambiguous and were secured through misrepresentations. Each claim is without merit. The cards are

unambiguous "dual-purpose" cards that both request an election and designate the LWW as the employee's representative. Dual-purpose authorization cards may be relied on to justify a *Gissel* order. *NLRB v. Anchorage Times Pub. Co.,* 637 F.2d 1359, 1368–69 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 1375, 70 L.Ed.2d 115 (1981). Moreover, the record is devoid of evidence that those attending the organizational

Subsequent to this demonstration of majority support, the Company engaged in serious and pervasive unfair labor practices. The Board concluded that under the circumstances it was unlikely a fair rerun election could be held. In *Gissel* the Court held:

> It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under ... the Act, the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.

*NLRB v. Gissel Packing Co.*, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32 (citations omitted). Accordingly, we defer to the Board's expert determination that a fair rerun election is impossible. Such deference is particularly warranted here, where there is ample evidence in the record of majority support prior to the commission of serious unfair labor practices by the Company.[4]

## C. The Company Was Afforded An Opportunity To Cross-Examine Witnesses

■ The Company asserts that the ALJ barred it from cross-examining the General Counsel's witnesses on the subject of drug use at the organizational meetings held at Venckus' residence. Venckus was lawfully terminated in November 1984, three months after the meetings occurred, for attempting to sell cocaine to Company employees. From this event the Company theorizes that drugs were used at the organizational meetings.

The Company has no basis for a good faith argument that it was precluded from

cross-examining witnesses. The record unequivocally demonstrates that the Company cross-examined five witnesses on the subject of drug use at the organizational meetings. The ALJ ruled that the General Counsel was entitled to inform witnesses of their Fifth Amendment privilege against self-incrimination prior to cross-examination. Mr. Kirshman, counsel for the Company, suggested that the witnesses be so informed. This was the only limitation imposed on Mr. Kirshman's cross-examination. This limitation was reasonable under the circumstances and, in any event, Mr. Kirshman consented to it.

The petition for enforcement is GRANTED.

---

meeting were misled as to the purpose of the cards.

**4.** In *Gissel* the court identified two categories of cases in which bargaining orders are appropriate. In the first category, an employer's unfair labor practices must be so outrageous and pervasive that a bargaining order is almost always necessary. *Gissel,* 395 U.S. at 613–14, 89 S.Ct. at

1939–40. In the second category of cases, the employer's conduct is less offensive but still severe enough to justify a bargaining order if a fair rerun election is impossible and the union demonstrated majority support with valid authorization cards. *Id.* at 614–15, 89 S.Ct. at 1940. This case fits squarely within the second category.